IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MICHAEL EVANS,                              )
                                            )
                Plaintiff,                  )
                                            )
        v.                                  )
                                            )
CITY OF CHICAGO, Present and Former         )    04 C 3570
Chicago Police Officers ANTHONY             )
KATALINIC, FRED HILL, WILLIAM MOSHER,       )    Judge Coar
JOHN McCABE, THOMAS McKENNA, DENNIS         )
BANAHAN, JOSEPH DiLEONARDI, JOHN            )
GRIFFITH, RICHARD O'CONNELL, PAUL           )
NEALIS, PETER DIGNAN, THOMAS FERRY,         )
PATRICK McGROARTY, JOSEPH DiGIACOMO,        )
ROY MARTIN, EDWARD LERACZ, DANIEL           )
SWICK and JOHN RYAN,                        )
                                            )
                Defendants.                 )

## PLAINTIFF'S COMBINED LOCAL RULE 56.1(b)(3)(B) STATEMENT OF ADDITIONAL FACTS IN OPPOSITION TO BOTH THE CITY'S AND THE DEFENDANT OFFICERS' MOTIONS FOR SUMMARY JUDGMENT

NOW COMES Plaintiff, MICHAEL EVANS, by his attorneys, LOEVY & LOEVY,

Locke Bowman of the MacARTHUR JUSTICE CENTER, and Karen Daneil of the BLUHM

LEGAL CLINIC at NORTHWESTERN UNIVERSITY SCHOOL OF LAW, and respectfully

submits the following Statement of Additional Facts pursuant to Local Rule 56.1(b)(3)(B):[1]

---

[1] In order to simplify things as much as possible, this document combines Plaintiff's Statement of Facts in response to both the Defendant Officers and the City's Motions for Summary Judgment with his original (previously-filed) Statement of Facts in support of his own Motion for Summary Judgment. Accordingly, this Statement begins with Paragraph 142, picking up where the prior Statement left off. Throughout, all references to lettered Exhibits refer to Plaintiff's previously-filed two volume set of Exhibits in Support of Summary Judgment, and references to all numbered exhibits refer to the two volume set of Plaintiff's Exhibits in Combined Opposition to Defendants' Motions for Summary Judgment.

## I. BACKGROUND

143. Plaintiff's Exhibit 7 contains the official file maintained by the Chicago Police Department under RD No. 017051 for the Cabassa investigation. *Pltf. Exhibit 7, Pltf. Exhibit 10, Laverty Aff. ¶¶ 11-12.* The set of police reports maintained under this RD number (Exhibit 7) is supposed to constitute the complete set of reports relating to this investigation. *Id.*

144. At trial, Mr. Evans' defense attorney subpoenaed the complete homicide file on the Lisa Cabassa murder. *Pltf. Exhibit 8, Bates 4678.* The prosecutors told the court that Mr. Evans had received "every bit" of every document which the Police Department had supplied to the prosecution. *Pltf. Exhibit 8, Bates 4680.*

145. At trial, Mr. Adams argued that the police might be withholding police reports, citing as an example a police officer named Hajek who pulled a previously-undisclosed report from his pocket on the witness stand. *Pltf. Exhibit 8, Bates 4683-85.* The prosecutors insisted that it was the State's understanding that the defense had received every document in the possession of the Police Department. *Id. at 4680.*

145. For the Cabassa case, there are a number of steps which Chicago Police investigators either clearly did take, or else would have taken, which are missing from the Official File. *Pltf. Exhibit 10, Laverty Aff. ¶¶ 23-57.* All such steps would have been documented in the unofficial -- and undisclosed -- Unit and/or Street Files. *Id. ¶ 24.* There were thus documented substantive investigative actions taken in the Cabassa investigation containing exculpatory and impeaching information which were withheld from Mr. Evans' criminal defense team. *Id. ¶¶ 1-57, 94.*

## II. UNIT FILE AND/OR STREET FILE PRACTICE

146. During the time of the Cabassa investigation, it was the policy and practice of homicide detectives to keep certain exculpatory materials (including notes, Memos, and other documentation relating to ongoing investigations) away from the Official File which was produced to criminal defendants in discovery. *Pltf. Exhibit 10, Laverty Aff. ¶ 94.* This result was accomplished as described in the following paragraphs.

147. For prolonged investigations (*i.e.*, those that were not immediately closed), it was standard practice for Chicago Police homicide detectives in the 1970s to maintain three separate sets of files: (i) the Offical File maintained in the Records Division at 11th and State; (ii) the Unit File, also known as the Area File or the Homicide File; and (iii) the Street or Running File. *Pltf. Exhibit 10, Laverty Aff. ¶¶ 9-11.*

148. The Unit File was kept in Area headquarters in a filing cabinet in the sergeant's office. *Pltf. Exhibit 10, Laverty Aff. ¶ 15; Pltf. Exhibit 28, Hickey Dep. 51.*

149.    For homicide investigations, the Unit File contained the reports that were placed in the Official File, plus a number of other documents, such as Memos (including "to/from Memos" and "all watch Memos") prepared by detectives over the course of their investigations. *Pltf. Exhibit 10, Laverty Aff. ¶¶ 13, 15.* These Memos were used to coordinate efforts between teams of investigators, and supervisors reviewed them, but did not need to approve them. *Id.*

150.    The Unit File also included notes memorializing witness interviews and other investigatory steps taken in the case. *Pltf. Exhibit 10, Laverty Aff. ¶ 14.*

151.    As a matter of practice, it was understood that the investigators would not include the Unit File's Memos, notes, and witness interviews in the official file that was produced to criminal defense counsel. *Pltf. Exhibit 10, Laverty Aff. ¶¶ 13-14; Pltf. Exhibit 28, Hickey Dep. 42-43, 49, 52-54, 56.*

152.    There once existed a Unit File No. 76-4 relating to the Cabassa investigation. *Pltf. Exhibit 11, Chicago's 3rd Amended Resp. to 3rd Set of Interrogs, ¶ 10.* It no longer exists and was destroyed by someone whose identity remains unknown. *Id.*

153.    There also once existed a "Homicide File No. 76-27" relating to the Cabassa investigation. *Pltf. Exhibit 12, Chicago's 2nd Amended Resp. to 1st Set of Req. to Admit, ¶ 42.* The City is without sufficient information to admit or deny whether "all" of the contents of this file were provided to the Cabassa prosecutors or Mr. Evans. *Id.*

154.    For prolonged investigations, teams of detectives also maintained individual Street or Running Files. *Pltf. Exhibit 10, Laverty Aff. ¶ 16.* There could be more than one Street File for a given investigation, depending on the number of detectives involved and the detectives' personal practices. *Id. ¶ 16.*

155.    Street Files typically contained copies of the official reports, as well as the detectives notes regarding the developments in the investigation. *Pltf. Exhibit 10, Laverty Aff. ¶ 17.* Detectives treated their Street Files as their personal property, and they were not subject to supervisor review or production to criminal defendants. *Id. at 17.*

156.    For an investigation as lengthy and complex as the Cabassa murder, there would definitely have been a Unit File. *Pltf. Exhibit 10, Laverty Aff. ¶ 18.* For an investigation of this nature, it would have been standard practice for detectives conducting interviews, canvassing for leads, following up on tips, and so forth to take and preserve notes of their activities. *Id. ¶ 20.*

157.    It also would have been standard practice for different teams of detectives (some on different shifts) to prepare to/from and inter-watch memos informing their colleagues of their activities and requesting that additional steps be taken by other detectives. *Pltf. Exhibit 10, Laverty Aff. ¶ 20; Pltf. Exhibit 28, Hickey Dep. 44-45, 69-71.* All such memos would have been kept in Unit and/or Street Files. *Id.*

158. During the 1970s, it was standard practive for some investigators and supervisors in Area 2 to exlcude from the official reports all aspects of the investigation that were inconsistent with the main story line of the investigation. *Pltf. Exhibit 10, Laverty Aff. ¶ 56.* Detectives omitted evidence that contradicted key witness, showed them to lack credibilty, or established that their testimony was false, coerced, suggested, or pressured by the investigators. *Id.*

159. In the opinion of former Homicide Detective Frank Laverty, the Official File for the Cabassa investigation appears to have been "sanitized" in the manner described in the previous paragraph. *Pltf. Exhibit 10, Laverty Aff. ¶¶ 56-57.*

## III. EVIDENCE WITHHELD FROM MR. EVANS VIA STREET/UNIT FILES

160. It would have been standard procedure for the police to have conducted extensive interviews of the Cabassa family to learn, *inter alia,* all possible details of Lisa's separation from her brother; her habits and activies; places she was forbidden to go; the family's suspicions about people they knew to have interacted with her; her activities on the day she disappeared; places she would have gone if not home; names/information regarding all people living in the home. *Pltf. Exhibit 10, Laverty Aff. ¶ 26.* None of the documentation from said interviews is contained in the Official File. *Id.*

161. Given the subsequent change of the time Lisa was last seen from roughly 6:00 to roughly 8:00 p.m., there would have been re-interviews of all family members and Manuel Silva, and there should be documents regarding the reasons for the change, which detectives were present when the change occurred and their role in accomplishing that shift, whether any witness continued to maintain it was the original time, and the detectives' evaluation of the credibilty of the change. *Pltf. Exhibit 10, Laverty Aff. ¶ 27.* None of the documentation from said interviews is contained in the Official File. *Id.*

162. There are a number of investigative activities relating to Januszewski that would have been contemporaneously documented but for which there are no contemporaneous documentation in the RD reports or Official File. *Pltf. Exhibit 10, Laverty Aff. ¶¶ 30-42.* All of the following are examples of circumstances for which the contemporaneous documentation would have previously existed but is now missing:

a. Januszewski's initial contact with the police, where, how, and by whom was she interviewed, and references to the reward which precipitated her coming forward. *Id. ¶ 31,*

b. The detention of Januszewski against her will on two seperate occasions, when she first came forward and when she identified Mr. Evans 42 days after the murder. *Id. ¶ 32,*

c.      The change by Januszewski for the time she left work from 6:37 p.m. to 8:05 p.m., including notes from an interview probing the reason for the difference in her story. *Id. ¶ 33;*

d.      Multiples interviews described by Januszewski between January 20 and February 5, 1976, and trips to the station for further investigation to view line-ups. *Id. ¶¶ 35, 39;*

e.      Januszewski's description of a third person present at the scene of the abduction, in contrast to her original statement *(Pltf Exhibit J)* describing only two men. *Pltf Exhibit 10, Laverty Aff ¶ 38;*

f.      Januszewski's claim to have seen the offender on January 23, 1976 on the street near Colfax and 87th Street. *Id. ¶ 40;*

g.      The statements by Januszewski's husband, Harry, to Katalinic and the other detectives that he (Harry) did not believe Januszewski's story. *Id. ¶ 41;*

h.      Januszewski's statements to Katalinic, Hill and Ferry that she did not want to testify. *Id. ¶ 42*


163.    The detectives would certainly have considered the possibility that Lisa was killed by someone closely connected with the Cabassa family who might have molested her in the past. *Pltf Exhibit 10, Laverty Aff ¶ 44.* With that possibility in mind, the detectives would have conducted follow-up interviews of any relatives and frequent visitors to the Cabassa home, but there is no documentation of any such interviews. *Id.*

164.    The detectives would certainly have attempted to either document or refute whether or not James Davis was Earl Jones as Januszewski claimed, particularly since Davis denied it and there is nothing else to suggest it was true. *Pltf Exhibit 10, Laverty Aff ¶ 45* There is no documentation in the Official File of any investigative efforts on this subject. *Id.*

165.    The detectives would have interviewed Ramon Cabassa, described in the reports as Lisa's cousin. *Pltf Exhibit 10, Laverty Aff ¶ 46.* There is no report of any such interview. *Id.*

166.    There should have been reports concerning police follow up regarding the phone calls to Jackson Park Hospital on the night Lisa disappeared. *Pltf Exhibit 10, Laverty Aff ¶ 47.* This would have included obtaining Message Unit Detail reports from the phone company and questioning of suspects as to whether they made the calls. *Id.* There are no reports regarding these activities in the file. *Id.*

167. Regarding the semen found on the rectal swab, there are no notes, Memos or reports reflecting whether any blood tests were suggested or performed to determine if the blood types or secretions matched or excluded Evans, Davis, Terry, or other suspects. *Pltf. Exhibit 10, Laverty Aff. ¶¶ 49, 92.* There is reason to believe that these tests would have been requested, given the problems and inconsistencies in Januszewski's account. *Id.* There are no reports regarding these activities in the file. *Id.*

168. Regarding the blood found in the alley, there is no indication of the additional investigation, including requests for crime lab reports to determine if the blood matched any suspects. *Pltf. Exhibit 10, Laverty Aff. ¶ 50.* There are no reports regarding these activities in the file. *Id.*

169. The seasoned and experienced homicide detectives who worked on the Cabassa investigation would have been searching for a sexual predator acting alone, possibly connected to the Cabassa family. *Pltf. Exhibit 10, Laverty Aff. ¶¶ 58-62.* Januszewski's story would have been discounted by said investigators as not credible, and documented in the file as the same. *Id. ¶¶ 63-86*

170. A police report dated January 17, 1976 refers to "information developed" by Inv. McCabe and Mosher relating to a "suspect" named Albert Foster. *Pltf. Exhibit 7, Bates Z00022.* There are no further references anywhere in the file to this "information" or why Foster was in fact considered a "suspect" or whatever further steps the investigators took toward proving his guilt or ruling him out. *Pltf. Exhibit 7.*

171. A police report dated January 17, 1976 refers to a suspect named Reignald Hairston who arrived at the hospital with a lacerated penis around 6:45 p.m. on the date of Lisa's murder, and, according to the report, the doctors thought his injuries could have been caused by forcing himself on a small girl. *Exhibit 7, Bates Z00025.* The report states that "investigation continues," but there is no other reference in the files to any of the other subsequent information the detectives gathered about Mr. Hairston. *Pltf. Exhibit 7.*

172. A police report dated January 19, 1976 refers to several recidivist sex offenders in the neighborhood, some of whom had modus operandi similar to the Cabassa murder. *Pltf. Exhibit 7, Bates Z00032.* The report indicates that "investigation continues," but with the exception of Tony Davenport, there is no other reference in the files to any of the other subsequent information the detectives gathered about these sex offenders. *Pltf. Exhibit 7.*

173. According to Laverty, the detectives in Area 2 would have followed up on these and other sex offenders as suspects, but would have kept the fruits of this investigation segregated in their unit or Street Files. *Pltf. Exhibit 10, Laverty Aff. ¶ 48.*

174. A police report dated January 19, 1976 refers to a suspect named Robert Lewter who took a polygraph and apparently failed because "he was unable to follow or comprehend any instructions necessary for the testing. . ." *Pltf. Exhibit 7, Bates Z00033.* There is no reference in the file to any follow-up investigation, including any follow-up polygraph, of this suspect. *Id.*

175. There are no police reports, and no mention other in the file, about the creation of the composite sketch, how it was created, who participated in creating it, where it was created, and whether other sketches were also created. *Pltf. Exhibit 7.* The first reference to the sketch in the file is January 28 (two weeks after the murder) and that reference answers none of the foregoing questions. *Pltf. Exhibit 7, Bates Z00037.*

176. The actual composite sketches drawn with Januszewski's assistance remain missing to this day. *Pltf. Exhibit 13, Chicago's Resp. to 1st Set of Req. to Admit, ¶ 82.* All that remains is the Chicago Police Department Daily Bulletin dated January 27, 1976, into which a black and white copy of the sketches was incorporated. *Pltf. Exhibit 14.*

177. A police report dated January 28, 1976 refers to a suspect named Carl Wilson who was arrested because he allegedly matched the composite sketch drawn by Januszewski. *Pltf. Exhibit 7, Bates Z00037.* There is no reference in the file to any follow-up investigation, including any follow-up polygraph or any line-up conducted with Januszewski, relating to this suspect. *Id.*

178. A police report dated February 7, 1976 refers back to a previously-taken interview by Inv. Wiley and Thompson of Rafael and Tommy Hernandez. *Pltf. Exhibit 7, Bates Z00047.* There was no contemporaneous report involving this interview. *Pltf. Exhibit 7.*

179. A police report dated November 2, 1976 describes how Katalanic and Hill made efforts to find the men "depicted in the composite drawings" and how "men who closely resembled the composits were brought in and photographed." *Pltf. Exhibit 7, Bates Z00050.* However, none of these photographs were produced to Mr. Evans' defense and none exist. *Pltf. Exhibit 7, Exhibit 8, Bates TRAN 203-04.* There are also no police reports or other documents in the file disclosing the names of men were "brought in" because they "closely resemebled" the composit, or how this resemblance was determined, and which witnesses claimed there was a resemblance. *Pltf. Exhibit 7.*

180. An eight page report dated February 27, 1976 regarding Mr. Evans' arrest contains much information that was gathered previously by the detectives but never memorialized until this February 27, 1976 police report. *Pltf. Exhibit 7, Bates Z00051-58.* For example, this report describes a phone call from Januszewski dated February 23, 1976 allegedly reporting alleged threats. *Id.*

181.     A police report dated March 10, 1976 describes five suspects whose fingerprints were cross-checked against a potential piece of evidence. *Pltf. Exhibit 7, Bates Z00063.* However, there is nothing memorialized in the official file about why at least two of these men (Stephen Gordon and Wilton Wiley) were being treated as suspects in this investigation. *Pltf. Exhibit 7.*

182.     A police report dated March 23, 1976 describes how the detectives "obtained information" about Earl Jones' brother, but the report does not say how the information was obtained or who it was obtained from. *Pltf. Exhibit 7, Bates Z00065.*

183.     A police report dated May 21, 1976 describes the arrest of James Davis as the person previously believed to have been known as Earl Jones. *Pltf. Exhibit 7, Bates Z00075-76.* However, there is no memorialization in this report, or elsewhere in the file, as to how the detectives came to believe that Davis was in fact Jones. *Pltf. Exhibit 7.*

184.     A police report dated November 2, 1976 describes an "earlier statement" by Mr. Evans. *Pltf. Exhibit 7, Bates Z00057, ¶ 3.* There are no reports, notes, or other documents relating to this earlier statement by Mr. Evans, and it no longer exists. *Pltf. Exhibit 7.*

185.     On or about February 27, 1976, DiLeonardi told the *Chicago Tribune* that Mr. Evans was identified after "four or five witnesses came forward with information after composite sketches were made from descriptions by three other witnesses." *Pltf. Exhibit 9, 2/27/76 Tribune article; Pltf. Exhibit 13, Chicago's Resp. to 1st Set of Req. to Admit, ¶ 83.* There are no documents in existence reflecting what these witnesses were, or what they claimed to know. *Pltf. Exhibit 13, Chicago's Resp. to 1st Set of Req. to Admit, ¶¶ 83-85.*

186.     Sam Parker gave a statement to Area 2 detectives in January shortly after the murder when the police were "interviewing everybody in the neighborhood. *Pltf. Exhibit 31, Parker Dep. 64-67.* This statement did not get contemporaneously memorialized in the official file and was not documented at all until after Evans' arrest in February. *Pltf. Exhibit 7.*

187.     Columbus Thomas gave a statement to Area 2 detectives in January shortly after the murder after the busted into his house and took him to the police station. *Pltf. Exhibit 30, 48-51.* This statement did not get contemporaneously memorialized in the official file and was not documented at all until after Evans' arrest in February. *Pltf. Exhibit 7.*

188.     Angelo Strickland gave a statement to Area 2 detectives in January shortly after the murder. *Pltf. Exhibit 25, Strickland Dep. 27-34.* This statement never got memorialized in the official file, contemporaneously or otherwise. *Pltf. Exhibit 7.*

189.     The police told Angelo Strickland that there was a witness claiming that Strickland had commited the Cabassa murder. *Pltf. Exhibit 25, Strickland Dep. 54-55.* There is no witness statement or any other reference implicating Strickland in the Cabassa murder anywhere in the official file. *Pltf. Exhibit 7.*

190. Around the time of the abduction, Patty Burke gave at least two statements to homicide detectives, including Sgt. Ferry, relating to Mr. Evans. *Pltf Exhibit 8, Burke Tr. at Bates TRAN 00384-86, 393-94.* There is no document in the official file relating to Burke's statements about Mr. Evans. *Pltf Exhibit 7.*

191. Katalinic interviewed Januszewski about her knowledge of the Cabassa murder on January 19, 1976. *Pltf Exhibit 8, Katalinic Tr. at Bates 5057-62.* There is no document in the official file relating to Januszewski's statements in that regard until more than a month later (February 27, 1976). *Pltf Exhibit 7.*

192. According to Januszewski, "soon after" telling the police that she had seen the abduction, Januszewski told Katalinic and Hill that she recognized an Earl Jones being present at the scene. *Pltf Exhibit 8, Januszewski Tr. at Bates 4826-27.* There is no document in the official file relating to Januszewski's statements in that regard until more than a month later (February 27, 1976). *Pltf Exhibit 7.*

193. At some point after January 14, 1976, Januszewski was taken past the home of Earl Jones by Inv. Katalinic, Hill, Mosher, or McCabe. *Pltf Exhibit 8, Januszewski Tr. at Bates 4796-97.* There is no document in the official file relating to this event or any statements made by Januszewski on the subject. *Pltf Exhibit 7.*

194. At some point prior to February 1976, Januszewski told Katalinic that she was not sure whether she had seen the abduction of Lisa Cabassa, or "whether the incident that she had witnessed was merely an older brother bringing his sister home." *Pltf Exhibit 8, at Bates SAO 1523.* There is no documentation anywhere in the official file relating to Januszewski's statements in that regard. *Pltf Exhibit 7.*

195. On the date that Januszewski "identified" Mr. Evans, Sgt. Ferry was called into the room where she was being held in order to arrange to give her financial assistance. *Pltf Exhibit 2, Ferry Dep. 103-04.* When Sgt. Ferry left the room, that is when the State's Attorneys entered. *Id. at 116.* None of that is documented in the Official File. *Pltf Exhibit 7.*

196. Defendants claim that Mr. Evans "confessed" but then "recanted" before his statement was transcribed by the State's attorney. *Pltf Exhibit 7, 2/27/76 report at 8.* In connection with that claim they created a police report that stated falsely that Evans had confessed then recanted. Id.; Pltf. Exhibit 1, Evans Dep. 77.

197. At Mr. Evans' trial, the prosecutor produced no documents from the youth file based on the State's representation to the Court of the State's understanding that the youth file "would contain the same reports as the homicide file." *Pltf Exhibit 8, Bates 4680-81.*

198. In case such as this one, there would have been a separate Missing Persons File containing infomration developed by the police, such as the circumstances of Lisa's disappearance, the exact time she went missing, the family's theories about where she was going, etc. *Pltf Exhibit 10, Laverty Aff.* ¶ *22.* The documents from this file would not be identical to those in the Official File. *Id.*

199. A police report dated February 3, 1976 refers to an unidentified "witness" identifying Jeffrey Coleman's photograph while searching through the 1974 Bowen High School Yearbook. *Pltf. Exhibit 7, Bates Z00039.* There is no indication on the face of this police report as to the **name** of this "witness" who identified Coleman and who supposedly had information relating to the Cabassa homicide.

200. A police report dated February 3, 1976 refers to an unidentified "witness" participating in a live line-up involving a Jeffrey Coleman, who was apparently a suspect in the Cabassa murder. *Pltf. Exhibit 7, Bates Z00039.* There is no indication on the face of this police report as to the **name** of this "witness" who participated in viewing this line-up.

201. It is unusual to have a police report where the name of the witness who viewed a line-up is not listed on the report. *Pltf. Exhibit 2, Ferry Dep. 240.* Sgt. Ferry had no explanation for why the report involving Mr. Coleman *(Pltf. Exhibit 7, Bates Z00039)* omits this information, and he has never seen any other reports displaying this omission. *Pltf. Exhibit 2, Ferry Dep. 241.*

202. When suspects were given polygraph examinations pursuant to homicide investigations, those suspects were asked questions and gave witness statements. *Pltf. Exhibit 20, polygraph documents.* The resulting statements were recorded in writing by the polygraph examiners. *Id.*

203. The detectives did not receive the documents back from the polygraph section, and they were not part of the file. *Pltf. Exhibit 5, McGroarty Dep. 111-12.*

204. The documents created in connection with polygraph examinations were not maintained with the case reports which comprised the Official File, but rather were kept separately at the Crime Lab for 3-4 years, after which they were sent to the warehouse. *Pltf. Exhibit 21, Chicago's Resp. to 4th Set of Interrogs,* ¶ *6.* As a matter of practice, these documents would not be produced to criminal defendants pursuant to his subpeona requesting the Official File (*Pltf. Exhibit 22, Chicago's Resp. to Suppl. Interrogs,* ¶ *1*) and they were not part of the file produced to Mr. Evans' defense team. *See Exhibit 7, Pltf. Exhibit 23, Chicago's Resp. to 2nd Set of Req. to Admit,* ¶ *30 (unable to deny).*

205. There existed six different witnesses statements within the set of polygraph documents created in the Cabassa investigation. *Pltf. Exhibit 20, polygraph documents.* These documents were not all produced to Mr. Evans pursuant to subpoena requesting the Official File. *Pltf. Exhibit 22, Chicago's Resp. to Suppl. Interrogs,* ¶ *1.*

## IV. DESTRUCTION OF EVIDENCE

206. The police report dated February 27, 1976 states that Januszewski is "mentioned in an earlier report." *Pltf. Exhibit 7, Bates Z00053.* However, this "earlier report" mentioning Januszewski (contents unknown) is not part of the official file and no longer exists. *Pltf. Exhibit 7.*

207. A police report dated February 27, 1976 states that Evans was interviewed by Ponne and Rodriguez on January 15, 1976. *Pltf. Exhibit 7, Bates Z00056, ¶ 3.* Ponne testified that if he interviewed Mr. Evans, either he or his partner would have taken notes and would have created a supplementary police report. *Pltf. Exhibit 3, Ponne Dep. 26-29; Pltf. Exhibit 10, Laverty Aff. ¶ 28.*

208. The police report created by Ponne/Rodriguez after their original interview of Mr. Evans was not part of the official file and no longer exists. *Pltf. Exhibit 7.*

209. Youth Officer Phil Centracchio testified at Mr. Evans' criminal trial that that Lisa's mother, Carmen Cabassa, reported that her daughter was last seen around 6:30 p.m. *Pltf. Exhibit H, Bates 4198-4201.* This report has never been located. *Pltf. Exhibit 7.*

210. A police report dated February 3, 1976 refers to Jeffrey Coleman being identified by a witness as resembling the composits drawn by Januszewski. *Pltf. Exhibit 7, Bates Z00039.* The police photographed Coleman, but neither the photograph of Coleman, nor the photograph from the Coleman line-up *(Pltf. Exhibit 7, 2/3/76 report, Bates 3475-76)* was provided to Mr. Evans' defense because the police claimed that it was missing. *Pltf. Exhibit 8, Bates TRAN 203-04.* Photographs from line-ups were supposed to be maintained by the police. *Pltf. Exhibit 4, O'Connell Dep. 157-59.*

211. There would have been a police report created by Inv. Russo concerning Januszewski's viewing of the Bowen High School yearbook on February 2, 1976; Inv. Russo's report is not in the file. *Pltf. Exhibit 10, Laverty Aff. ¶ 36.*

212. There would have been police reports created concerning Januszewski's viewing of photographs of people brought to the station as a result of the publication of the composite sketches; the file does not include these reports. *Pltf. Exhibit 10, Laverty Aff. ¶ 37.*

## V. DEFENDANTS' ADMISSIONS ABOUT THE STREET FILES PRACTICE

213. Former Superintendent Richard Brzeczek admits that the following findings made by Judge Shadur in his Palmer decision (Palmer v. City of Chicago, 562 F.Supp. 1067, 1069 (N.D.Ill. 1983)) (hereafter, "Palmer"), were true as a factual matter: Factual Finding Nos. 9, 14(a), 14(b), 15(a), and Legal Conclusion 4(a). *Pltf. Exhibit 27, Brzeczek Dep. 83, 103-04, 106.* Leaving aside whether the opinion was reversed in part due to standing or other issues, the above-cited factual summaries were an accurate description of the reality in the Department. *Id.*

214. With respect to the Cabassa investigation, there would have been an "Area File," also known as the "Running File" or an Area "Homicide File" or "Unit File" for the Cabassa investigation; it was located in the file cabinet in Area 2. *Pltf. Exhibit 5, McGroarty Dep. 159, 166; Pltf. Exhibit 4, O'Connell Dep. 107, 197-98; Pltf. Exhibit 6, DiLeonardi Dep. 40; Pltf. Exhibit 28, Hickey Dep. 51.*

215. Prior to <u>Palmer</u>, sometimes detectives in Area 2 put their investigative notes and other materials in this Area File described in the two preceding paragraphs. *Pltf. Exhibit 4, O'Connell Dep. 120-21; Pltf. Exhibit 27, Brzeczek Dep. 73-76, 78-79.* Copies of letters and correspondence also were sometimes kept in this file. *Id.*

216. Prior to <u>Palmer</u>, some of the materials that were being placed in the detectives Unofficial Files (either Area Files or Unit Files or Street Files) were not being placed in the Official File. *Pltf. Exhibit 27, Brzeczek Dep. 78-79; Pltf. Exhibit 4, O'Connell Dep. 120-21; Pltf. Exhibit 28, Hickey Dep. 42-43, 49, 52-54, 56.* When he learned about it in the <u>Palmer</u> litigation, this problem bothered Superintendent Brzeczek, and he enacted changes. *Pltf. Exhibit 27, Brzeczek Dep. 78-79.*

217. All of the detectives had access to the Area or Unit File, and could put things in or take things out without having to sign anything. *Pltf. Exhibit 5, McGroarty Dep. 167.*

218. Detectives also kept their notes and unfinished reports on their individual briefcases or clipboards, which were kept in their private lockers or cars. *Pltf. Exhibit 5, McGroarty Dep. 162-64; Pltf. Exhibit 15, Nealis Dep. 142-43; Pltf. Exhibit 4, O'Connell Dep. 207; Pltf. Exhibit 2, Ferry Dep. 69.* It was not an uncommon practice for detectives to keep their own files and notes on their clipboards or legal pads. *Pltf. Exhibit 4, O'Connell Dep. 108-10; Pltf. Exhibit 4, O'Connell Dep. 209-11; Pltf. Exhibit 16, Banahan Dep. 121-23.*

219. Sgt. Ferry admits that the files described in the preceding paragraphs were called "street files." *Pltf. Exhibit 2, Ferry Dep. 286-92.* There was no rule or regulation prohibiting detectives from maintaining Street Files. *Id. at 287.* According to Sgt. O'Connell, the concept of the "street file" may have come up as often as every shift. *Pltf. Exhibit 4, O'Connell Dep. 206-07.*

220. Prior to <u>Palmer</u>, sometimes witness statements were treated as Unofficial Reports and did not get placed into the Official File. *Pltf. Exhibit 27, Brzeczek Dep. 57.*

221. Prior to <u>Palmer</u>, where detectives kept private notes regarding investigative leads that did not pan out, no official report was created, and the detectives eventually disposed of the notes. *Pltf. Exhibit 4, O'Connell Dep. 109-12; Pltf. Exhibit 16, Banahan Dep. 92.*

222. Prior to <u>Palmer</u>, it was McGroarty, Ferry, Banahan, and Nealis' understanding that there were no written guidelines about what belonged in the official file. *Pltf. Exhibit 5, McGroarty Dep. 170-71; Pltf. Exhibit 15, Nealis Dep. 147, 151; Pltf. Exhibit 2, Ferry Dep. 69, 288; Pltf. Exhibit 16, Banahan Dep. 121-23.* There were no guidelines or practices in place or supervision as far as what detectives were supposed to do with the papers relating to the investigations they were working on. *Pltf. Exhibit 4, O'Connell Dep. 209-11, 230.*

223. Prior to <u>Palmer</u>, there were no guidelines or rules governing when a detective's notes were supposed to get memorialized into an official police report, and when they were not. *Pltf. Exhibit 2, Ferry Dep. 69-71, 288; Pltf. Exhibit 16, Banahan Dep. 121-23; Pltf. Exhibit 27, Brzeczek Dep. 41-45, 90-91.* It was totally up to an officers' discretion. *Id.*

224. Prior to <u>Palmer</u>, there was no training provided to help ensure that documents in the detectives personal files were also placed in the official file. *Pltf. Exhibit 4, O'Connell Dep. 122-24, 230.*

225. Prior to <u>Palmer</u>, detectives were not expected to give their notes to the State's Attorney's Office. *Pltf. Exhibit 2, Ferry Dep. 288.*

226. Prior to <u>Palmer</u>, no one in Area 2 ever responded to supboenas issued by criminal defendants. *Pltf. Exhibit 4, O'Connell Dep. 122.* In connection with said subpoenas, there was no procedure or protocol in place for ensuring that detectives checked their personal files for responsive documents. *Id. at 122-23.*

227. Over the entire course of his 30+ year with the Chicago Police Department, no one ever asked Sgt. McGroarty, or anyone else that he is aware of, if they had any documents responsive to a subpoena for documents served by a criminal defendant. *Pltf. Exhibit 5, McGroarty Dep. 173-74.*

228. Prior to <u>Palmer</u>, at the conclusion of a given case, the file maintained separately at Area 2 was shipped downtown by mail to be disposed of downtown. *Pltf. Exhibit 4, O'Connell Dep. 117-19.* There was no paperwork created in connection with the disposal of the homicide file from Area 2. *Id. at 118.*

229. As some point in the early 1980s (as a result of <u>Palmer</u>), the Department changed its policies and enacted a rule requiring the preservation of all interview notes. *Pltf. Exhibit 4, O'Connell Dep. 230-32.* Prior to that time, the Department took no steps to ensure that interview notes of witness statements were produced to prosecutors and criminal defendants. *Id.*

230. After the rule change in the early 1980s, Sgt. O'Connell made clear to his detectives that they had to start maintaining and preserving records better. *Pltf. Exhibit 4, O'Connell Dep. 230-33.* Changes did not occur overnight, but at some point in the months that followed, detectives began to understand that they had to preserve and maintain relevant records. *Id. at 233-34.*

231. Per the Department's rules and practices, the detectives in Area 2 had the discretion not to create police reports memorializing their interviews, such as the interviews with Januszewski. *Pltf. Exhibit 2, Ferry Dep. 65-66.* If no report of such interviews were created, there was no expectation by the Department about what the detectives were supposed to do with their notes, including destroying them. *Id. at 65-68.*

232. After there was public attention focused on "Street Files" in or about 1982, the Department changed the rules to require detectives to save their notes. *Pltf. Exhibit 2, Ferry Dep. 298.* On April 20, 1982, Superintendent Brzeczek issue an order applicable to all Officers stating that "Effective immediately, as a result of a temporary restraining order issued by federal district court judge Thomas R. McMillen, the contents of all police department investigative files known as office, unit, or working files and sometimes referred to as 'street or running' files will be kept intact. No documents, materials, or notes shall be removed from these files." *Pltf. Exhibit 34, teletype.*

233. Prior to that change in 1982, detectives broke no rules or regulations of the department by maintaining Street Files. *Pltf. Exhibit 2, Ferry Dep. 298; Exhibit 17, Tuider Dep. 36-38, Pltf. Exhibit 27, Brzeczek Dep. 78-79.* After the rule changed, detectives had to stop throwing away their notes. *Pltf. Exhibit 28, Hickey Dep. 92-98; Exhibit 17, Tuider Dep. 36-38.*

234. The City admits that the Department previously possessed Street Files from murder investigations from the 1970s. *Pltf. Exhibit 18, Chicago's Resp. to 3rd Set of Req. to Admit, ¶¶ 33-34.* Street Files, as defined by Judge Shadur in <u>Palmer</u>, existed prior to the changes enacted after <u>Palmer</u>. *Pltf. Exhibit 27, Brzeczek Dep. 87-89.*

235. The City was unable to locate any of the 300 Street Files ordered preserved in <u>Palmer</u>. *Pltf. Exhibit 19, Chicago's Resp. to "Court-Ordered Suppl. Discovery Per Judge Schenkier's May 3, 2005 Order, ¶ 1.* The City no longer possess any Street Files from murder investigations from the 1970s. *Pltf. Exhibit 18, Chicago's Resp. to 3rd Set of Req. to Admit, ¶ 30.*

236. The practice of the Chicago police detectives of creating and maintaining Street Files, to the extent such a practice existed, was not different in any substantive respect in 1976 than it was in 1982. *Pltf. Exhibit 18, Chicago's Resp. to 3rd Set of Req. to Admit, ¶¶ 6-8; Pltf. Exhibit 28, Hickey Dep. 45-46*

## VI. DETECTIVE HICKEY'S "STREET FILE PROJECT" AUDIT

237. After Judge McMillen's T.R.O. in 1982, former Chicago Police detective James Hickey was asked to conduct a fact-finding audit; his review was informally known as the "Street File Project." *Pltf. Exhibit 28, Hickey Dep. 7, 26-27, 29-32.* As part of his Project, Hickey toured the City to learn more about the prevailing practices. *Id. at 42-43.*

238. At the conclusion of his review, Hickey created a Memo summarizing the findings of the Street File Project. *Pltf Exhibit 28, Hickey Dep. 32-33.* The present whereabouts of the Memo (which has not been produced in this litigation) are unknown to Hickey, though he believes the Department should have it. *Id.*

239. Hickey's Street File Project led him to conclude that prior to <u>Palmer</u>, as a matter of practice there were in fact notes and Memos relating to criminal investigations which were not being placed in Official Reports in the Official File. *Pltf Exhibit 28, Hickey Dep. 42-43, 49, 52-54, 56, 74-75, 102-03.*

240. For example, Hickey discovered a "cabinet full" of informal Memos and communications relating to investigations in Area 2. *Pltf Exhibit 28, Hickey Dep. 74-75.* There was no policy or practice regarding retention of these materials. *Id. at 85.*

## VII. EXPRESS POLICY

241. <u>Brady v. Maryland</u> was decided in 1963.

242. In 1973, the Chicago Police Department dissemindated a "Training Bulletin" to its members, issued by then-Superintendent James B. Conlisk (hereafter, the "Training Bulletin"). *Pltf Exhibit 29, Training Bulletin, June 11, 1973.*

243. The Training Bulletin advised all Department members that the Illinois Supreme Court revised its discovery rules in October 1971 to permit a defense attorney to impeach witnesses and police officers with police reports. *Pltf Exhibit 29, Training Bulletin, June 11, 1973, at 1.* According to the Bulletin, this was in contrast to previous understanding that "the police report was viewed by the court as an internal communication device, which permitted a police officer to relate the circumstances of a crime to other members of the Department." *Id. at 1 ("however, this is no longer the sole purpose of the report").*

244. According to the Training Bulletin, in light of these changes in the discovery rules, the State's Attorneys' Office recommended to the Department that it make "changes in case report preparation. *Pltf Exhibit 29, Training Bulletin, June 11, 1973, at 1.* After studying the proposed recommendation, the Department adopted changes "to assist the State in its prosecution." *Id.*

245. Among the changes described in the preceding paragraph "to assist the State in its prosecution," the Training Bulletin directed Department members to:
> Opinions. Reporting officers are to eliminate their conclusions, opinions, feelings, and evaluations of witnesses and facts from the narrative portion of the original case reoprt. Conclusions on the part of the report writer whether based on deduction or personal feelings SHOULD NOT be made.

*Pltf Exhibit 29, Training Bulletin, June 11, 1973, at 1 (emphasis in original).*

246.    Instead, where detectives reached opinions and evaluations about problems with witness credibility, they created notes and Memos, which were not placed in the Official file which was produced to defense counsel. *Pltf. Exhibit 10, Laverty Aff. ¶¶ 13-20, 94; Pltf. Exhibit 28, Hickey Dep. 42-43, 49, 52-54, 56.*

## VIII.    JOHN BURGE'S INVOLVEMENT

247.    John Burge approved and signed off on the very first police report in the Official File, the report describing how Lisa Cabassa's body was recovered. *Pltf. Exhibit 7, 1/15/76 report, Bates 0000399.*

248.    John Burge asserted the Fifth and refused to answer when asked to explain the circumstances described in the police report which he signed relating to the Cabassa murder and the recovery of her body. *Pltf. Exhibit 24, Burge Dep. 11-12.*

249.    The Cabassa murder occured in the Fourth District, and there were patrol sergeants from the Fourth District providing at least some assistance on the case. *Pltf. Exhibit 7, 1/17/76 report, Bates 3443 (4th district Sgt. Morrin brought witnesses to the hospital); Pltf. Exhibit 4, O'Connell Dep. 130-32.* When patrol sergeants from the Fourth District provided assistance, they were expected to communicate with Area 2 detectives. *Pltf. Exhibit 4, O'Connell Dep. 138.*

250.    Sgt. Burge asserted the Fifth and refused to answer when asked whether he interviewed any suspects in connection with the Cabassa investigation. *Pltf. Exhibit 24, Burge Dep. 10.*

251.    After the murder, Angelo Strickland was interrogated about the Cabassa case by a Chicago police officer matching Sgt. Burge's physical description who Strickland presently believes to have been Burge. *Pltf. Exhibit 25, Strickland Dep. 50-53, 30, 44-45.*

252.    When Januszewski was held at the station against her will the second time, roughly six weeks after the murder, one of the sergeants came into the room and told her: "Sgt. Burge has a way of making people talk, something to that effect." *Exhibit I, Januszewski Dep. 165.* The use of the name "Burge" still "stick[s] out in her mind," and she remembers that "vividly." Id. at 166.

## IX.    SUPERVISORS' INVOLVEMENT GENERALLY

253.    The "various sergeants assigned to Area 2" were in charge of the Cabassa investigation. *Pltf. Exhibit 26, Chicago's Resp. to 3rd Set of Interrogs, ¶¶ 7-8.*

254. It would have been standard practice for different teams of detectives (some on different shifts) to report to their supervisors all of their activities on the case and to prepare to/from and inter-watch Memos informing their colleagues of their activities and requesting that additional steps be taken by other detectives. *Pltf Exhibit 10, Laverty Aff. ¶ 20.* All such Memos would have been kept in Unit and/or Street Files. *Id.*

255. Detectives had to get approvals from a sergeant before conducting polygraph examinations. *Pltf. Exhibit 4, O'Connell Dep. 160.* There were at least six polygraph examinations undertaken in the Cabassa investigation, including several murder suspects (Columbus Thomas and Sam Parker) and several known sex offenders (Steve Nosco and Robert Lewter). *Pltf. Exhibit 20, polygraph documents.*

256. When ordered to respond more precisely to the query who was in charge of the Cabassa investigation, the City responded that Lt. Griffith was in charge. *Pltf. Exhibit 19, City's Resp. to "Court-Ordered Suppl. Discovery Per Judge Schenkier's May 3, 2005 Order, ¶ 3.*

## X.  SGT. MCGROARTY

257. Sgt. McGroarty supervised, among others, Katalinic, Hill, Dignan, and Leracz, all of whom have taken the Fifth in this litigation regarding the Cabassa investigation. *Pltf Exhibit 5, McGroarty Dep. 12-14, 36.* From working together with them over the years, he got to know Katalinic and Hill "real well" (*id. at 16),* and he worked with Dignan and Leracz for at least a decade as well, and used to go golfing with them. *Id. at 56-57.*

258. Sgt. McGroarty was one of two homicide sergeants assigned to midnights in Area 2. *Pltf. Exhibit 5, McGroarty Dep. 12-14.* Midnight detectives worked on the Cabassa case when there was a lead from another shift, such as the need for an interview, that required night-time follow-up. *Id. at 26; Pltf. Exhibit 15, Nealis Dep. 40-42.*

259. Sometimes Sgt. McGroarty would fill in on the day and afternoon shift too, and he would take actions relating to the Cabassa investigation while working those shifts as well, such as directing a witness canvass. *Pltf. Exhibit 5, McGroarty Dep. 100-03; Exhibit 7 (1/17/76 report, Bates 3458), Pltf. Exhibit 4, O'Connell Dep. 24-25.*

260. As supervisor, Sgt. McGroarty read every supplementary report as they were created, whether by the afternoon shift or by the midnight shift. *Pltf. Exhibit 5, McGroarty Dep. 21.*

261. In terms of approving reports, it was Sgt. McGroarty's role to ask questions if there were things left out or if he felt there were things about the reports which he did not like, such as unexplained gaps in documenting the investigation. *Pltf. Exhibit 5, McGroarty Dep. 22-23.*

262. It was the sergeants, not the detectives, who were responsible for making the decisions relating to murder investigations. *Pltf. Exhibit 5, McGroarty Dep. 28-30; Pltf. Exhibit 2, Ferry Dep. 35, 39.*

263. Sgt. McGroarty admits that he was the sergeant primarily responsible for the Cabassa investigation. *Pltf. Exhibit 5, McGroarty Dep. 29-30 ("I believe I was. . .").* However, Sgt. McGroarty also testified that Sgt. O'Connell and Sgt. Ferry, too, were responsible for the Cabassa investigation. *Id. at 33 ("It was joined, it was everybody.").*

264. Sgt. McGroarty was the sergeant who personally responded to the scene of Lisa Cabassa's murder. *Pltf. Exhibit 7 (1/14/76 report, Bates Z0003; As such, he was the supervisor of the detectives assigned to the scene. *Pltf. Exhibit 5, McGroarty Dep. 37-38.* He assigned Leracz and Dignan to the case. *Id. at 114.*

265. After the murder, Sgt. McGroarty went to the hospital, where he met with Detectives Dignan and Leracz and informed them that Lisa's brother, Ricky, was the last one to see her alive. *Pltf. Exhibit 7 (1/15/76 report at 6, Bates 3444).*

266. Sgt. McGroarty then went to the Cabassa home (along with Dignan, Leracz and Lt. Griffith) for the interview of Ricky Cabassa, whereupon Ricky reported that he left home with his sister around 6:00 p.m. *Pltf. Exhibit 7 (1/15/76 report at 6, Bates 3444).*

267. Sgt. McGroarty also signed off on the report created by Detectives Manella and Tuider relating to witness canvases at local schools and the distribution of the police bulletin containing Januszewski's sketches to area businesses. *Pltf. Exhibit 7 (1/16/76 report, Bates 3453).*

268. On January 15, 1976, Sgt. McGroarty assigned two detectives to canvass the 8500 block of Manistee. *Pltf. Exhibit 7 (1/17/76 report, Bates 3458).* The resulting police report describes the detectives' lead regarding Reginald Harriston as a possible suspect. *Id.*

269. On February 28, 1976, Sgt. McGroarty signed off on a report containing further updates on the Cabassa investigation, including an attempt to corroborate the whereabouts of Mr. Evans on the night of the murder, and information about Earl Jones. *Pltf. Exhibit 7 (2/27/76 report, Bates 3494).*

270. On March 22, 1976, Sgt. McGroarty signed off on a report containing further updates on the Cabassa investigation, including Earl Jones and Januszewski. *Pltf. Exhibit 7 (3/22/76 report, Bates 3505).*

271. On November 2, 1976, Sgt. McGroarty signed off on a report containing further updates on the Cabassa investigation, including other suspects. *Pltf. Exhibit 7 (11/2/76 report, Bates 3453).*

272. On September 29, 1976, Sgt. McGroarty signed off on a court attendence report authored by Katalinic, summarizing how Mr. Evans' conviction was reversed for failure to disclose the monetary payments to Januszewski. *Pltf. Exhibit 7 (9/29/76 report, Bates 3529).*

273. Sgt. McGroarty was interacting with Katalinic and Hill during the investigation. *Pltf. Exhibit 5, McGroarty Dep. 135-36.* It was typical for Sgt. McGroarty to interact with the detectives on the shift and ask to questions about ongoing investigations, including their police reports and the witnesses discussed therein. *Pltf. Exhibit 15, Nealis Dep. 34-38.*

274. Sgt. McGroarty claims that the only role he had vis-a-vis approving police reports was to check for errors. *Pltf. Exhibit 5, McGroarty Dep. 22.* This was not true. *Pltf. Exhibit 15, Nealis Dep. 36-37.*

275. Sgt. McGroarty claims that he had no discussions with Katalinic, Hill, Dignan, or other detectives under his supervision about their interrogations of Mr. Evans or Ms. Januszewski. *Pltf. Exhibit 5, McGroarty Dep. 150.*

276. Sgt. McGroarty claims there was never a time that he knew who Mr. Evans or Judy Januszewski was, or Keith Jones, Columbus Thomas, Paul Terry, or any suspect in the murder. *Pltf. Exhibit 5, McGroarty Dep. 120-21.*

277. After the murder, Sgt. McGroarty and Lt. Griffith personally went to the Cabassa home to interview her family. *Pltf. Exhibit 5, McGroarty Dep. 78; Pltf. Exhibit 7 (1/15/76 police report).* It was not common for a lieutenant and sergeant to go to a victim's home *(Pltf. Exhibit 4, O'Connell Dep. 140)* and it was also "very unusual" for Sgt. McGroarty to go somewhere with Lt. Griffith *(Pltf. Exhibit 5, McGroarty Dep. 79-80)*; Sgt. O'Connell has no explanation for why he did so in this case. *Id.*

278. The original missing person police report states that on the day of the murder, Lisa's brother (Ricky) left home around 6:00 p.m., and that after walking a number of blocks, Lisa turned around and went home alone. *Exhibit W, 1/15/76 police report at 6.* At some point thereafter, the Cabassa family changed the time that Lisa supposedly left home. Specifically, contrary to the original version that Lisa was last seen around 6:30 p.m., the Cabassa witnesses each testified at both trials that Lisa had really been last seen around 8:00 p.m. *Exhibit H, Bates 1178 (Ricky Cabassa); Bates 1147-48 (Carmen Cabassa); Bates 4083, 4099-4103 (Ricky Cabassa); Bates 4075 (Carmen Cabassa).*

279. Sgt. McGroarty claims no present recollection whatsoever of going to the victim's home to interview Ricky Cabassa, or what was discussed with Mr. Cabassa. *Pltf. Exhibit 5, McGroarty Dep. 78.*

280. According to Sgt. McGroarty, no sergeant was in charge of the Cabassa investigation. *Pltf. Exhibit 5, McGroarty Dep. 31-32.*

281.    In reality, all of the sergeants on the watch, including Sgt. McGroarty, were equally and jointly in charge of the Cabassa investigation. *Pltf. Exhibit 4, O'Connell Dep 51; Pltf. Exhibit 2, Ferry Dep. 39, 209-10, Pltf. Exhibit 26, Chicago's Resp. to 3rd Set of Interrogs, ¶¶ 7-8.*

282.    Sgt. McGroarty, Sgt. O'Connell, and Sgt. Ferry would discuss the progress of the Cabassa investigation with one another at the shift changes, and they would pass on to the next shift the information learned from the prior shift. *Pltf. Exhibit 4, O'Connell Dep. 81; Pltf. Exhibit 2, Ferry Dep. 207-09.*

283.    Because the murder happened on the midnight watch, the midnight sergeant (Sgt. McGroarty) was primarily in charge of the initial investigation. *Pltf. Exhibit 4, O'Connell Dep. 52-53.*

284.    The two primary detectives assigned to solve the Cabassa homicide were working on the midnight watch under Sgt. McGroarty's supervision. *Pltf. Exhibit 4, O'Connell Dep. 55-56.*

285.    According to Sgt. McGroarty, no particular detective was in charge of the Cabassa investigation. *Pltf. Exhibit 5, McGroarty Dep. 31-32, 38-45.* According to Sgt. McGroarty, there was no one assigned to serve the role of captaining the investigation. *Id. at 51-52.*

286.    However, there was always a team of detectives assigned to be primarily responsible for taking the lead in solving homicides. The Cabassa homicide was no exception, and Katalinic and Hill, and possibly several others were assigned. *Pltf. Exhibit 4, O'Connell Dep. 22, 55-60; Pltf. Exhibit 2, Ferry Dep. 27-29, 34-35.*

287.    According to Sgt. McGroarty, there were no intra-shift written communications relating to investigations other than formal police reports. *Pltf. Exhibit 5, McGroarty Dep. 47-48.* According to Sgt. McGroarty, there were no Memos of that nature, no written communications; everything was oral. *Id. at 48, 105-08, 187-88.*

288.    However, there did exist Memos whereby the supervisor from one shift would pass along information to the supervisor of the next shift relating to developments in ongoing murder investigations. *Pltf. Exhibit 4, O'Connell Dep. 80-83, 214-15; Pltf. Exhibit 15, Nealis Dep. 129-30; Pltf. Exhibit 10, Laverty Aff. ¶ 13, 20, Exhibit 16, Banahan Dep. 126-34, Pltf. Exhibit 28, Hickey Dep. 69-71.* These Memos were not made part of the official file, and were discarded and not kept. *Pltf. Exhibit 4, O'Connell Dep. 83-87, 214-15; Pltf. Exhibit 16, Banahan Dep. 126-27.* This was true for Memos for which the information was never input into formal police reports. *Pltf. Exhibit 4, O'Connell Dep. 90-91.*

289.    Sgt. McGroarty claims that to/from Memos were not kept in the official file because none existed. *Pltf. Exhibit 5, McGroarty Dep. 183-84.* Sgt. McGroarty claims that in his entire career, he has never heard of a to/from Memo relating to a homicide. *Id. at 184-85.*

290. Sgt. Ferry admits that to/from Memos relating to a homicide should be maintained in the official file. *Pltf. Exhibit 2, Ferry Dep. 100-01.* It was standard practice to create to/from Memos relating to ongoing investigations and maintain them outside the official file. *Pltf. Exhibit 10, Laverty Aff. ¶ 20; Exhibit 16, Banahan Dep. 126-27.*

291. The watch commander sergeants created documents known as major crime incident worksheets, and these documents might have information relating to ongoing investigations. *Pltf. Exhibit 4, O'Connell Dep. 215-18, 221.* There documents were never kept in the official file; instead, they were "sent downtown" to homicide headquarters. *Id.*

292. Sgt. McGroarty claims that there was no public pressure to solve the Cabassa homicide. *Pltf. Exhibit 5, McGroarty Dep. 120.* Sgt. McGroarty further claims that he has never even heard the term "heater case." *Id. at 123-24.*

293. However, because of the nature of the crime and the young victim, the Cabassa case was a high profile "heater" case. *Pltf. Exhibit 4, O'Connell Dep. 40-41, 47.* All available homicide investigators from South Side units had their days off cancelled and were assigned to the Cabassa case. *Pltf. Exhibit 9, 1/19/77 Tribune article; Pltf. Exhibit 13, Chicago's Resp. to 1st Set of Req. to Admit, ¶ 62.*

294. Sgt. McGroarty claims he is not familiar with the term "street files" other than what he has read about it in the newspapers. *Pltf. Exhibit 5, McGroarty Dep. 155.* He has never heard of the term on the job (*id.*) and had no knowledge of any such practice. *Id. at 157-58.* Sgt. McGroarty insists he was never aware of any detectives maintaining witness statements without putting them into the file. *Pltf. Exhibit 5, McGroarty Dep. 175.*

295. Sgt. McGroarty claims he was not aware of a single complaint involving misconduct during the whole time he was at Area 2, which was between 1969 and 1986. *Pltf. Exhibit 5, McGroarty Dep. 10, 61-62.* Sgt. McGroarty did not learn about the allegations of misconduct during interrogations until after he left the Department and read about them in the newspapers. *Id. at 61-62.*

## XI.  SGT. O'CONNELL

296. According to Sgt. McGroarty, the afternoon sergeant would have been the one giving Katalinic and Hill certain assignments relating to the Cabassa investigation. *Pltf. Exhibit 5, McGroarty Dep. 109.* Sgt. O'Connell was the sergeant in charge of the day watch from 1973 through his retirement in 1987. *Pltf. Exhibit 4, O'Connell Dep. 18.*

297. Sgt. O'Connell admits he was in charge of the Cabassa investigation. *Pltf. Exhibit 4, O'Connell Dep. 50; but see id.* (subsequently claiming he was not in charge). He ran the day shift, and the day shift generally took a bigger role in investigating homicides. *Id. at 75-77.*

298. As the watch commander, Sgt. O'Connell was the decision-maker who would make decisions as to the allocation of detective resources vis-a-vis investigations. *Pltf. Exhibit 4, O'Connell Dep. 62-63.*

299. Sgt. O'Connell acknowledges that his police work "probably" was responsible for Mr. Evans' conviction. *Pltf. Exhibit 4, O'Connell Dep. 190.*

300. It was Sgt. O'Connell's job function to provide assistance to investigators who were conducting investigations. *Pltf. Exhibit 4, O'Connell Dep. 71.* If he had suggestions that might help investigations, he would give them to the investigators, and that happened on most shifts. *Id. at 72-73.*

301. Sgt. O'Connell claims he never gave any assistance to the Cabassa investigators as far as how they should conduct this investigation. *Pltf. Exhibit 4, O'Connell Dep. 71.*

302. On January 15, 1976, Sgt. O'Connell signed off on the police report created by Dignan and Leracz (both of whom have taken the Fifth) describing the Lisa Cabassa murder. *Pltf. Exhibit 7 (1/15/76 report, Bates 3439-45).* Sgt. O'Connell's job was to read reports such as this one with a critical eye to see if there was a need for further follow up investigation. *Pltf. Exhibit 4, O'Connell Dep. 104.*

303. The January 15, 1976 report on which Sgt. O'Connell signed off stated in several places that the victim was last seen around 6:00-6:30 p.m. *Pltf. Exhibit 7 (1/15/76 report, Bates 3441, 3444)* Sgt. O'Connell reviewed the details of this report before signing off on it. *Pltf. Exhibit 4, O'Connell Dep. 151.*

304. On January 17, 1976, Sgt. O'Connell signed off on a police report documenting the autopsy performed on Lisa Cabassa. *Pltf. Exhibit 7 (1/17/76 report, Bates 3457); Pltf. Exhibit 4, O'Connell Dep. 153.*

305. On January 19, 1976, Sgt. O'Connell signed off on a police report relating to an active suspect in the Cabassa investigation named Robert Lewter. *Pltf. Exhibit 7 (1/19/76 report, Bates 3461-62); Pltf. Exhibit 4, O'Connell Dep. 154-55.*

306. On January 28, 1976, two beat officers thought they had identified a suspect who resembled the composit sketches created by Januszewski; the sergeant who was contacted to report this information was Sgt. O'Connell. *Pltf. Exhibit 7 (1/28/76 report, Bates Z00037).*

307. On February 3, 1976, Sgt. O'Connell was personally present when Januszewski participated in a line-up of apparent suspects in the Cabassa investigation. *Pltf. Exhibit 4, O'Connell Dep. 156; Exhibit 7 (2/3/76 report, Bates 3475-76).*

308. On February 5, 1976, Sgt. O'Connell signed off on the court attendence report for Officer Leracz to go to the coroner's hearing along with the victims' parents. *Pltf. Exhibit 7 (2/5/76 report, Bates 3477); Pltf. Exhibit 4, O'Connell Dep. 162.*

309. On or about March 4, 1976, Sgt. O'Connell was notified about an effort by two youth officers from the youth division to determine whether Mr. Evans was ever seen in the company of a sex offender from the neighborhood named Davenport. *Pltf. Exhibit 7 (3/4/76 report, Bates 3497); Pltf. Exhibit 4, O'Connell Dep. 172-73.*

310. On March 22, 1976, Januszewski claimed that she received a threatening letter, and the sergeant who was notified was Sgt. O'Connell. *Pltf. Exhibit 7 (3/22/76 report, Bates 3501-02); Pltf. Exhibit 4, O'Connell Dep. 178-79.*

311. On November 17, 1976, Sgt. O'Connell signed off on a police report relating to the arrest and murder charges against James Davis relating to the Cabassa investigation. *Pltf. Exhibit 7 (11/17/76 report, Bates 3540-41).* This is the report that "cleared and closed" the Cabassa case. *Id.*

312. Sgt. O'Connell could not recall any other "heater" cases from the 1970s other than the Cabassa case, and the only other heater case he recalled being involved with during his entire career was the Richard Speck nurse murders. *Pltf. Exhibit 4, O'Connell Dep. 42-46.*

313. Sgt. O'Connell claims he remembers nothing about the investigation, including Januszewski, and even whether Mr. Evans was a suspect. *Pltf. Exhibit 4, O'Connell Dep. 28, 64-65, 196-97.*

314. Sgt. O'Connell testified that no matter what question he was asked about the Cabassa investigation or Michael Evans' role in it, he was going to have to say he did not remember. *Pltf. Exhibit 4, O'Connell Dep. 152.*

315. Sgt. O'Connell acknowledges he "might have" known about the circumstances whereby Januszewski changed the time she allegedly saw what she saw. *Pltf. Exhibit 4, O'Connell Dep. 64-65.*

316. Sgt. O'Connell admitted that Area 2 kept a file relating to homicide investigations known as a "running file." *Pltf. Exhibit 4, O'Connell Dep. 107.* Later in his deposition, Sgt. O'Connell denied that he used the term "running file" and claimed he has never heard the term. *Id. at 113-14.*

317. However, Sgt. McGroarty admits that the term "running file" was a term used to describe the file maintained by the detectives at Area 2 separate from the official file. *Pltf. Exhibit 5, McGroarty Dep. 159, 166.*

## XII. COMMANDER DILEONARDI

318. At the time of the Cabassa investigation, DiLeonardi was the City-wide homicide commander overseeing detective investigations of murders and sexual crimes. *Pltf. Exhibit 6, DiLeonardi Dep. 9-12.* In that capacity, the six homicide lietenants reported directly to him. *Id.*

319. The watch commander sergeants created daily briefings called "major crime incident worksheets." *Pltf. Exhibit 4, O'Connell Dep. 215-16, 221, 225-26.* The documents would start on midnight shift and get added to as the day went along. *Id. at 222-23.*

320. The briefings described in the previous paragraph were written for, and were sent daily to, the commander of the homicide unit, Mr. DiLeonardi. *Pltf. Exhibit 4, O'Connell Dep. 221-22.* DiLeonardi kept abreast of the developments in investigations, including the Cabassa investigation. *Pltf. Exhibit 16, Banahan Dep. 82.*

321. DiLeonardi claims that back in 1976, he had no knowledge whatsoever of, or contact with, the progress of the ongoing Cabassa investigation. *Pltf. Exhibit 6, DiLeonardi Dep. 19-22, 28-32, 54, 56.* DiLeonardi further denies that he was kept apprised of the developments in this investigation. *Id. at 54-55.* DiLeonardi insists that he never had any such knowledge, even 25 years ago. *Id. at 60.*

322. Not only does DiLeonardi claim he does not recall Mr. Evans or Januszewski, DiLeonardi also claims there was never a time that he was ever told Mr. Evans was a suspect in this murder or that Januszewski had identified Mr. Evans. *Pltf. Exhibit 6, DiLeonardi Dep. 28.*

323. On or about January 18, 1976, DiLeonardi "took personal charge of the [Cabassa] case." *Pltf. Exhibit 9, 1/19/76 Tribune article.* On or about that date, DiLeonardi told the *Chicago Tribune* that he "assigned the case to homicide detectives from other investigative units" to solve the Cabassa murder. *Id.*

324. DiLeonardi presently denies that he took charge of the case. *Pltf. Exhibit 6, DiLeonardi Dep. 48.*

325. On January 15, 1976, the date the murder was first reported, Commander DiLeonardi (driving Car 85) was one of the "personnel assigned," along with Sgt. McGroarty and others who were working on this investigation. *Pltf. Exhibit 7, 2/26/76 report, Bates 3441.*

326. Six weeks later, when Mr. Evans was arrested based on Januszewski's implication of Evans, Commander DiLeonardi was one of the personnel assigned, along with Katalinic, Hill, Ferry, and others who were working on this investigation. *Pltf. Exhibit 7, 2/26/76 report, Bates 3488.* For purposes of that assignment, DiLeonardi was assigned to car 42, along with an Asisstant Deputy Chief. *Id.*

327.     On the date of Evans' arrest, Thomas McCarthy, the Assistant State's Attorney who took Evans' statement personally met with DiLeonardi (who had come to Area 2), and the investigating detectives; DiLeonardi discussed the status of the investigation.  *Pltf. Exhibit 32, McCarthy Dep. 38-39, 71-75*

328.     On or about January 14, 1976, DiLeonardi told a reporter for the *Chicago Tribune* that Lisa's murder probably happened in a car someplace other than the alley where the body was dumped.  *Pltf. Exhibit 9, 1/15/76 Tribune article.*

329.     On or about February 27, 1976, DiLeonardi told the *Chicago Tribune* that a key witness provided the "missing link" in the arrest of Mr. Evans for the Cabassa murder.  *Pltf. Exhibit 9, 2/28/76 Tribune article.*

330.     On or about November 18, 1976, DiLeonardi told a reporter for the *Chicago Tribune* that there had been a "new break in the case" when a youth supposedly came forward to implicate Evans.  *Pltf. Exhibit 9, 11/19/76 Tribune article.*  According to DiLeonardi, "[t]his new evidence substantiates the earlier testimony of Januszewski".  *Id.*

331.     On or about November 18, 1976, DiLeonardi told a reporter for the *Chicago Tribune* that James Davis, Paul Terry, Sam Parker, and Columbus Thomas were suspects in the Cabassa murder.  *Pltf. Exhibit 9, 11/19/76 Tribune article.*

332.     On or about December 17, 1976, DiLeonardi told a reporter for the *Chicago Tribune* that Keith Jones had not been coerced to implicate Mr. Evans, despite Jones' claim that he had been coerced.  *Pltf. Exhibit 9, 12/18/76 Tribune article.*  According to DiLeonardi, "[t]here would have been no reason to intimidate a witness who was volunteering information."  *Id.*

333.     DiLeonardi acknowledges that he made the foregoing public statements to the press.  *Pltf. Exhibit 6, DiLeonardi Dep. 52-54*

334.     DiLeonardi claims that he is certain there was no public pressure to solve the Cabassa murder.  *Pltf. Exhibit 6, DiLeonardi Dep. 29-30.*  According to DiLeonardi, there was no more or less pressure to solve this murder compared to any other.  *Id. at 30.*

## XIII.  FRANK LAVERTY

335.     Frank Laverty was a Chicago Police Officer for over 29 years, and was a homicide detective between 1973 and 1983, split roughly between Area 1 and 2.  *Pltf. Exhibit 10, Laverty Aff. ¶ 6.*  Estimating conservatively, he was involved in more than 500 homicide and 100 sex crime investigations.  *Id.*

336. Over the course of his career, Laverty became familiar with the practices, customs and procedures of the Department's homicide detectives, and he testified in both Jones cases (criminal and civil) and the Palmer litigation about the document maintenance practices of Chicago homicide detectives. *Pltf. Exhibit 10, Laverty Aff. ¶ 7.*

## XIV  MISCELLANEOUS

337. Defendants Katalinic, Hill, Dignan, DiGiacomo, Leracz, McKenna, Ryan, and Swick all took the Fifth in response to every allegation in Plaintiff's operative Complaint, including whether they framed Mr. Evans and fabricated probable cause by manipulating Januszewski. *Pltf. Group Exhibit 40, Answers to Amended Complaint.*

338. In or about January 2003, Lisa's mother told Chicago Tribune reporters Steve Mills and Maurice Possley that: "The timing was changed. The time was wrong. That's all I'll say."

339. On January 6, 2005, Illinois Governor Rod Blagojevich, by the authority vested in him by the Illinois Constitution, granted Michael Evans a "pardon based upon innocence with order permitting expungement under the provisions of 20 ILCS 2630/5. *Pltf. Exhibit 33.*

340. According to ASA McCarthy, McCabe "may very well have been" present during the meeting at Area 2 with the ASA, the investigators, and DiLeonardi on the night Evans was interrogated. *Pltf. Exhibit 12, McCarthy Dep. 72-73.*

## XV.  OTHER DUE PROCESS VICTIMS

341. During his arrest, Mr. Evans was beaten in the back approximately ten times with a leather instrument that he believes to be a blackjack. *Pltf. Exhibit 10, Evans Dep. 36-38.*

342. On or about June 7, 1984, Chicago police detectives in Area 2, including Defendant Dignan, engaged in the following acts against Phillip Adkins: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Cannon, 3/27/1984, pp. 1-98.*

343. On or about October 28 and 29, 1983, Chicago police detectives in Area 2, including Defendant Dignan, engaged in the following acts against Gregory Banks used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Banks, 5/17/1985, pp. 256-282.*

344. On or about July 21 through July 23, 1986,. Chicago police detectives in Area 2, including Defendant Dignan, engaged in the following acts against Stephen Bell: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf Exhibit 38 (PDF- CD), Testimony in People v. Bell, 11/20/1986, pp. 506-578*

344. On or about September 10, 1982, Chicago police detectives in Area 2, including Defendant Dignan, engaged in the following acts against Rodney Benson: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf Exhibit 38 (PDF- CD), Motion to Suppress in People v. Benson, 12/23/1982, pp. 1-2*

345. On or about June 24 and 25, 1984, Chicago police detectives in Area 2, including Defendant Dignan, engaged in the following acts against Robert Billlingsley: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf Exhibit 38 (PDF- CD), Deposition in Patterson v. Burge, 3/28/2005, pp. 1-55, Deposition in Hobley v. Burge, 6/30/2005, pp. 1-485.*

346. On or about May 24, 1984, Chicago police detectives in Area 2, including Defendant DiGiacomo, engaged in the following acts against Franklin Burchette: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf Exhibit 38 (PDF- CD), Affidavit in People v. Burchette, 10/21/1985, pp. 1-4; Testimony in People v. Burchette, pp 1-20.*

347. On or about November 2, 1983, Chicago police detectives in Area 2, including Defendant Dignan, engaged in the following acts against Darrell Cannon: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf Exhibit 38 (PDF- CD), Testimony in People v. Cannon, 3/27/1984, pp. 1-149*

348. On or about January 28, 1984, Chicago police detectives in Area 2, including Defendants Dignan and Ryan, engaged in the following acts against Thomas Craft: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf Exhibit 38 (PDF- CD), Statements to Office of Professional Standards, 8/20/1993, pp. 1-6.*

349. On or about February 5 and 6, 1982, Chicago police detectives in Area 2, including Defendant McCabe, engaged in the following acts against Sylvester Green: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf Exhibit 38 (PDF- CD), Testimony in People v. Green, 3/4/1983, pp. 21-76.*

350. On or about September 10, 1982, Chicago police detectives in Area 2, including Defendant Dignan, engaged in the following acts against Lee Holmes: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Statements to Office of Professional Standards, 6/24/1993, pp. 1-4.*

351. On or about May 31, 1985, Chicago police detectives in Area 2, including Defendant Dignan, engaged in the following acts against Lonza Holmes: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Holmes, 12/12/1986, pp. 48-153.*

352. On or about January 28, 1984, Chicago police detectives in Area 2, including Defendant Dignan, engaged in the following acts against Lavert Jones: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Jones, 3/5/1987, pp. 703-765, 1604-1668.*

353. On or about January 12 and 13, 1984, Chicago police detectives in Area 2, including Defendant McCabe, engaged in the following acts against Leonard Kidd: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf. Exhibit 38 (PDF- CD), Affidavit in People v. Kidd, 2/14/2000, pp. 1-3.*

354. On or about September 2, 1983, Chicago police detectives in Area 2, including Defendant Leracz, engaged in the following acts against Jerry Mahaffrey: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Mahaffrey, 2/9/1984, 2/16/1984, pp. 34-54; 49-55, 101-154*

355. On or about September 25, 1977, Chicago police detectives in Area 2, including Defendant Dignan, engaged in the following acts against Virgil Robinson: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Robinson, 9/25/1977, pp. 22-39.*

356. On or about January 21, 1983, Chicago police detectives in Area 2, including Defendant Dignan, engaged in the following acts against Alonzo Smith: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Smith, 8/3/1983, pp. 117-184.*

357. On or about January 1 and 2, 1983, Chicago police detectives in Area 2, including Defendant Dignan, engaged in the following acts against Eric Smith: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf. Exhibit 38 (PDF- CD), Testimony in Patterson v. Burge, 3/21/2005, pp. 1-74.*

358. On or about July 21 through July 23, 1986, Chicago police detectives in Area 2, including Defendant Dignan, engaged in the following acts against Michael Tillman: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect . *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Tillman, 11/21/1986, pp. 855-950.*

359. On or about September 10, 1982, Chicago police detectives in Area 2, including Defendant Dignan, engaged in the following acts against Bobby Williams: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Statements to Office of Professional Standards, 1/29/1994, pp. 1-2.*

360. On or about September 10, 1982, Chicago police detectives in Area 2, including Defendant Dignan, engaged in the following acts against Stanley Wrice: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf. Exhibit 38 (PDF- CD), Statements to Office of Professional Standards, 9/23/1993, pp. 1-2.*

361. On or about August 5, 1972, Chicago police detectives in Area 2 engaged in the following acts against Rodney Mastin: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Sworn Statement of Rodney Mastin, 7/24/2004, pp. 1-44.*

362. On or about August 5, 1972, Chicago police detectives in Area 2 engaged in the following acts against Lindsey Smith: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Sworn Statement of Rodney Mastin, 7/24/2004, pp. 1-44.*

363. On or about August 5, 1972, Chicago police detectives in Area 2 engaged in the following acts against Clarence Hill: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Sworn Statement of Rodney Mastin, 7/24/2004, pp. 1-44.*

364. In or about September, 1972, Chicago police detectives in Area 2 engaged in the following acts against an unknown victim: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Sworn Statement of Detective Bill Parker, Patterson v. Burge, 10/4/2004, pp. 1-33.*

365. On or about May 30, 1973, Chicago police detectives in Area 2 engaged in the following acts against Anthony Holmes: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf. Exhibit 38 (PDF- CD), Sworn Statement of Anthony Holmes, 4/19/2004, pp. 1-56.*

366. In or about 1973, Chicago police detectives in Area 2 engaged in the following acts against Lawrence Poree: employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Sworn Statement of Lawrence Poree, 4/19/2004, pp. 1-55.*

367. Again, In or about 1973, Chicago police detectives in Area 2 engaged in the following acts against Lawrence Poree: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Sworn Statement of Lawrence Poree, 4/19/2004, pp. 1-55.*

388. On or about September 7, 1979, Chicago police detectives in Area 2 engaged in the following acts against Lawrence Poree: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Sanford et al., 2/10/1980; Sworn Statement of Lawrence Poree, 4/19/2004, pp. 1-55.*

389. On or about September 7, 1979, Chicago police detectives in Area 2 engaged in the following acts against Leroy Sanford: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Sanford et al., 2/10/1980; Sworn Statement of Lawrence Poree, 4/19/2004, pp. 1-55.*

390. On or about November 13, 1979, Chicago police detectives in Area 2 engaged in the following acts against James Lewis: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. James and Lewis, 3/10/1980, pp. 96-130.*

391. On or about November 13, 1979, Chicago police detectives in Area 2 engaged in the following acts against Edward James: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. James and Lewis, 3/10/1980, pp. 96-130.*

392. On or about September 20 through September 22, 1979, Chicago police detectives in Area 2 engaged in the following acts against George Powell: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Sworn Statement of George Powell, 6/14/2004, pp. 1-44.*

393. On or about September 20 through September 22, 1979, Chicago police detectives in Area 2 engaged in the following acts against Ollie Hammonds: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Sworn Statement of Ollie Hammonds, 8/25/2004, pp. 1-23.*

394. On or about September 28 and 29, 1979, Chicago police detectives in Area 2 engaged in the following acts against Tony Thompson: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Porch, Thompson, and Golden, 5/22/1981; Sworn Statement of Tony Thompson, Patterson v. Burge, 3/5/2005, pp. 1-64*

395. On or about September 28 and 29, 1979, Chicago police detectives in Area 2 engaged in the following acts against Willie Porch: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in Wilson v. City of Chicago, 6/27/1989, pp. 1861-1989.*

396. On or about September 28 and 29, 1979, Chicago police detectives in Area 2 engaged in the following acts against Raymond Golden: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in Wilson v. City of Chicago, 6/27/1989, pp. 1861-1989.*

397. On or about September 29, 1979, Chicago police detectives in Area 2 engaged in the following acts against Timothy Thompson: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Porch et al., 5/22/1981, pp. 42-74.*

398. On or about February 23, 1980, Chicago police detectives in Area 2 engaged in the following acts against Michael Coleman: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Coleman and King, 11/20/1980, pp. 54-102; 110-151.*

399. On or about February 23, 1980, Chicago police detectives in Area 2 engaged in the following acts against Derrick King: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Coleman and King, 11/20/1980, pp. 54-102; 110-151.*

400. On or about February 5 and 6, 1982, Chicago police detectives in Area 2 engaged in the following acts against Melvin Jones: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Jones, 08/5/1982, pp. 60-118.*

401. On or about February 9 through February 12, 1982, Chicago police detectives in Area 2 engaged in the following acts against Larry Milan: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in Wilson v. City of Chicago, June 1989.*

402.     On or about February 9 through February 12, 1982, Chicago police detectives in Area 2 engaged in the following acts against Paul Mike: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in Wilson v. City of Chicago, June 1989.*

403.     On or about February 9 through February 12, 1982, Chicago police detectives in Area 2 engaged in the following acts against Walter Johnson: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in Wilson v. City of Chicago, June 1989.*

404.     On or about February 9 through February 12, 1982, Chicago police detectives in Area 2 engaged in the following acts against Walter Johnson: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in Wilson v. City of Chicago, June 1989.*

405.     On or about February 9 through February 12, 1982, Chicago police detectives in Area 2 engaged in the following acts against Alphonso Pinex: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in Wilson v. City of Chicago, June 1989.*

406.     On or about February 12, 1982, Chicago police detectives in Area 2 engaged in the following acts against Donald White: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), White's Deposition in Wilson v. City of Chicago, 7/14/1989, pp. 1-130.*

407.     On or about February 12, 1982, Chicago police detectives in Area 2 engaged in the following acts against Dwight Anthony: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), White's Deposition in Wilson v. City of Chicago, 7/14/1989, pp. 1-130.*

408.     On or about February 14, 1982, Chicago police detectives in Area 2 engaged in the following acts against Andrew Wilson: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Wilson, 11/12/1982, pp. 1039-1151.*

409.     On or about February 14, 1982, Chicago police detectives in Area 2 engaged in the following acts against Jackie Wilson: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Wilson, 11/8/1982, pp. 721-795.*

410.     On or about February 14, 1982, Chicago police detectives in Area 2 engaged in the following acts against Doris Miller: used violence to intimidate her; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Wilson, 11/12/1982, pp. 1039-1079.*

411. On or about June 9, 1982, Chicago police detectives in Area 2 engaged in the following acts against Michael Johnson: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Deposition in Wilson v. Chicago, 6/14/1989, pp. 1-124*

412. On or about April 26 through April 28, 1983, Chicago police detectives in Area 2 engaged in the following acts against James Andrews: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Anderson, 10/1/1984, pp. 859-940*

413. On or about April 26 through April 28, 1983, Chicago police detectives in Area 2 engaged in the following acts against David Faultneroy: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Anderson, 10/1/1984, pp. 859-940*

414. On or about September 2, 1983, Chicago police detectives in Area 2 engaged in the following acts against Reginald Mahaffey: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Mahaffey, 2/9/1984, pp. 34-118*

415. On or about October 28 and 29, 1983, Chicago police detectives in Area 2 engaged in the following acts against David Bates: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Banks, 5/17/1985, pp. 203-255*

416. On or about November 18, 1983, Chicago police detectives in Area 2 engaged in the following acts against James Cody: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Cody, 4/23/1984, pp. 50-103*

417. On or about November 25, 1983, Chicago police detectives in Area 2 engaged in the following acts against Leonard Hinton: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Hinton, 7/1/1985, pp. 1-73*

418. On or about January 12 and 13 1984, Chicago police detectives in Area 2 engaged in the following acts against Leroy Orange: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Orange, 5/22/1985, pp. 1427-1566*

419. On or about October 28 and 29 1984, Chicago police detectives in Area 2 engaged in the following acts against Terry Harris: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Statements to Office of Professional Standards, 5/29/1986, pp. 1-6.*

420. On or about November 2 through November 4, 1984, Chicago police detectives in Area 2 engaged in the following acts against Stanley Howard: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Howard, 1/28/1987, pp. 22-76.*

421. On or about March 21, 1985, Chicago police detectives in Area 2 engaged in the following acts against Jesse Winston: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Statements to Office of Professional Standards, 1986 and 1990.*

422. On or about August 28, 1985, Chicago police detectives in Area 2 engaged in the following acts against L. C. Riley: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Riley, 3/13/1987, pp. 101-227.*

423. On or about October 9 through October 11, 1985, Chicago police detectives in Area 2 engaged in the following acts against Mearon Diggins: used violence to intimidate him; employed coercive interrogation tactics; and fabricated evidence to frame a suspect. *See Pltf. Exhibit 38 (PDF- CD), Sworn Statement of Mearon Diggins, 7/5/2004, pp. 2-38.*

424. On or about October 10, 1985, Chicago police detectives in Area 2 engaged in the following acts against Terry Williams: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Sworn Statement of Mearon Diggins. 7/5/2004, pp. 2-38.*

425. On or about October 30, 1985, Chicago police detectives in Area 2 engaged in the following acts against Shaded Mumin: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Mumin, 5/13/1987, pp. 1-118.*

426. On or about April 22 and 23, 1986, Chicago police detectives in Area 2 engaged in the following acts against Michael Arbuckle: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Motion to Suppress in People v. Arbuckle, 6/4/1986, pp. 1-6.*

427. On or about April 29 and 30, 1986, Chicago police detectives in Area 2 engaged in the following acts against Aaron Patterson: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Patterson, 3/30/1988, pp. 384-500.*

428. On or about April 29 and 30, 1986, Chicago police detectives in Area 2 engaged in the following acts against Eric Caine: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Caine, 9/25/1989, pp. 1648-1777.*

429. On or about August 10 through August 12, 1986, Chicago police detectives in Area 2 engaged in the following acts against Clarence Trotter: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Post Conviction Petition, pp. 1-82.*

430. On or about October 13, 1986, Chicago police detectives in Area 2 engaged in the following acts against Terrence Houston: used violence to intimidate him; employed coercive interrogation tactics; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Houston's Deposition in Houston v. Marblocki, 10/4/1988, pp. 1-81.*

431. On or about October 13, 1986, Chicago police detectives in Area 2 engaged in the following acts against Darrell Cleveland: used violence to intimidate him; employed coercive interrogation tactics; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Houston's Deposition in Houston v. Marblocki, 10/4/1988, pp. 1-81.*

432. On or about November 12, 1986, Chicago police detectives in Area 2 engaged in the following acts against Andrew Maxwell: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Maxwell, Thompson, and Howard, 7/23/1987, pp. 8-47.*

433. On or about November 12, 1986, Chicago police detectives in Area 2 engaged in the following acts against Jerry Thompson: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Maxwell, Thompson, and Howard, 7/23/1987, pp. 8-47.*

434. On or about November 12, 1986, Chicago police detectives in Area 2 engaged in the following acts against Jeffrey Howard: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Maxwell, Thompson, and Howard, 7/23/1987, pp. 8-47.*

435. On or about January 6, 1987, Chicago police detectives in Area 2 engaged in the following acts against Madison Hobley: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Hobley, 9/29/1987, pp. 1-121.*

436. On or about April 19 and 20, 1990, Chicago police detectives in Area 2 engaged in the following acts against Tony Anderson: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Anderson, 5/1/1991, pp. 21-68.*

437. On or about November 6, 1987, Chicago police detectives in Area 2 engaged in the following acts against Robert Smith: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), People v. Smith, 197 Ill. App. 3d 226, 227-230 (1st Dist. 1989).*

438. In or about December 1987 and January 1988, Chicago police detectives in Area 3 engaged in the following acts against Philip Walker: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Walker, 4/3/1989, pp. 10-57, Philip Walker's Deposition, 5/18/2005, pp. 30-156.*

439. In or about December 1987 and January 1988, Chicago police detectives in Area 3 engaged in the following acts against Johnny Walker: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Walker, 4/3/1989, pp. 10-57; Philip Walker's Deposition, 5/18/2005, pp. 30-156.*

440. In or about December 1987 and January 1988, Chicago police detectives in Area 3 engaged in the following acts against Andre Wilk: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Walker, 4/3/1989, pp. 10-57; Philip Walker's Deposition, 5/18/2005, pp. 30-156.*

441. On or about April 17, 1988, Chicago police detectives in Area 3 engaged in the following acts against Grayland Johnson: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Johnson, pp. 24-80.*

442. On or about June 24, 1988, Chicago police detectives in Area 3 engaged in the following acts against Donald Torrence: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Amended Complaint, Torrence v. City of Chicago, et al., 6/19/1989, pp. 1-4.*

443. On or about August 25 and 26, 1988, Chicago police detectives in Area 3 engaged in the following acts against Ronald Kitchen: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Kitchen, 9/19/1990, pp. 1234-1310.*

444. On or about September 21, 1990, Chicago police detectives in Area 3 engaged in the following acts against Cortez Brown: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Brown, 11/8/1991, pp. 1-37.*

445. On or about June 5, 1991, Chicago police detectives in Area 3 engaged in the following acts against Tyshaun Ross: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf. Exhibit 38 (PDF- CD), Statements to Office of Professional Standards, 7/16/1991, pp. 1-6.*

446. On or about August 8, 1991, Chicago police detectives in Area 3 engaged in the following acts against Jevon Delony: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Brooks and Delony, pp. 1190-1228.*

447. On or about August 8, 1991, Chicago police detectives in Area 3 engaged in the following acts against Maurice Delony: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v. Brooks and Delony, pp. 1190-1228.*

448. On or about September 25 and 26, 1991, Chicago police detectives in Area 3 engaged in the following acts against Marcus Wiggins: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Wiggins' Deposition, Wiggins v. Burge, 6/4/1996, pp. 62-230.*

449. On or about September 25 and 26, 1991, Chicago police detectives in Area 3 engaged in the following acts against Jesse Clemon: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v Clemon, 9/14/1992, pp. 3-27.*

450. On or about September 25 and 26, 1991, Chicago police detectives in Area 3 engaged in the following acts against Imari Clemon: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v Clemon, 9/14/1992, pp. 3-27.*

451. On or about September 25 and 26, 1991, Chicago police detectives in Area 3 engaged in the following acts against Damoni Clemon: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf. Exhibit 38 (PDF- CD), Testimony in People v Clemon, 9/14/1992, pp. 3-27.*

452.    On or about September 25 and 26, 1991, Chicago police detectives in Area 3 engaged in the following acts against Clinton Welton: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf Exhibit 38 (PDF- CD), Testimony in People v Clemon, 9/14/1992, pp. 3-27*

453.    On or about September 25 and 26, 1991, Chicago police detectives in Area 3 engaged in the following acts against Diyez Owen: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf Exhibit 38 (PDF- CD), Testimony in People v Clemon, 9/14/1992, pp. 3-27*

454.    On or about September 28, 1991, Chicago police detectives in Area 3 engaged in the following acts against Michael Peterson: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf Exhibit 38 (PDF- CD), Richardson's Affidavit, 8/11/2004, p. 1-3*

455.    On or about September 28, 1991, Chicago police detectives in Area 3 engaged in the following acts against Travis Richardson: used violence to intimidate him and employed coercive interrogation tactics. *See Pltf Exhibit 38 (PDF- CD), Richardson's Affidavit, 8/11/2004, p. 1-3*

456.    On or about November 22, 1991, Chicago police detectives in Area 3 engaged in the following acts against Ivan Smith: used violence to intimidate him; employed coercive interrogation tactics; fabricated evidence to frame a suspect; and improperly influenced witness testimony. *See Pltf Exhibit 38 (PDF- CD), Testimony in People v. Brooks, 4/15/1994, pp 265-285.*

457.    Of all of the victims listed in the preceding paragraphs, all are African American. Of the 55 police officers who perpetrated the abuses, 52 are white. *Pltf Exhibit 35, Taylor Aff.*

458.    In 18 of these cases, the victims specifically testified that they were subjected to racial epithets. *Pltf Exhibit 35, Taylor Aff.* Before he took the Fifth in this case, Detective Dignan testified in another case that he and the other detectives used the N-word in Area 2. *Pltf Exhibit 36, Dignan Dep. 59-67.*

RESPECTFULLY SUBMITTED:

_____
Attorneys for Plaintiff

Arthur Loevy
Jon Loevy
Mike Kanovitz
LOEVY & LOEVY
312 North May Street, Ste. 100
Chicago, IL 60607

Locke Bowman
MACARTHUR JUSTICE CENTER
University of Chicago Law School
1111 East 60th Street
Chicago, IL 60637

Karen Daniel
Center on Wrongful Convictions
BLUHM LEGAL CLINIC
Northwestern University School of Law
357 East Chicago
Chicago, IL 60611