IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| MICHAEL EVANS, | ) | |
|---|---|---|
| Plaintiff, | ) | 04 C 3570 |
| v. | ) | Judge Coar |
| CITY OF CHICAGO, et al. | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE
## TO THE CITY'S MOTION TO STRIKE

Now comes Plaintiff, Michael Evans, by his attorneys, and respectfully responds to the City's motion to strike as follows.

### Introduction

The impetus for the City's motion to strike a large chunk of Plaintiff's summary judgment record can be summarized succinctly: "if you can't beat it, may as well try to strike it." Faced with no persuasive response to the mountain of evidence that the City's widespread practice caused Mr. Evans' injuries, the City makes a misguided attempt to bar Mr. Evans from proving his case. The motion should be denied for the following reasons.

### A. Defendants' Doomsaying Scenario About "Months" Of Trial And "93 Mini-Trials" Is Nothing But A Strawman

The City first erects a strawman, attempting to "scare" the Court into dismissing Plaintiff's practice claim because it supposedly will be too cumbersome to prove. Even if that were somehow a valid basis to grant summary judgment, it is totally inapplicable here. Plaintiff wishes to be perfectly clear: he will call none of these roughly 100 witnesses at trial. There will be no mini-trials, nor "months" of testimony on the subject.

Instead, as previously indicated in Plaintiff's Response to the City's Motion for Summary Judgment, Plaintiff will rely at trial primarily on the testimony of a police practices expert named Anthony Bouza, a long-time New York City policeman and a former commander of all units in the Bronx, as well as the former chief of police of Minneapolis, Minnesota. Mr. Bouza has reviewed all of the evidence now in dispute, as well as much else, and has formed certain opinions relating thereto. See Exhibit A. In particular, Mr. Bouza opines that these were the types of allegations which should have prompted the Department to take some action, yet its response was to do nothing. As Mr. Bouza's report explains, a properly functioning Department would have seriously investigated (much less disciplined) at least some of the alleged infractions. Here, by contrast, the evidence reviewed by Mr. Bouza led him to conclude that the Department did the opposite: it affirmatively endeavored to cover it all up. See Exhibit A.

Crucially, aside from relying on certain documented, undisputed findings (e.g., the O.P.S.' own infamous "Goldston report", and certain judicial holdings and admissions by municipal agents, including former Superintendent Brzezcak), Mr. Bouza is not purporting to opine about whether or not any particular victim is telling the truth about his account. Mr. Bouza cannot know this, and does not claim to. Rather, his expert testimony is that, as a person with much experience in these sorts of things, this evidence strikes him as an extraordinary number of complainants, many (with no apparent connection to one another) making very similar allegations of abuse of a relatively idiosyncratic nature. Any legitimately-functioning Department would have taken these allegations very seriously. Here, the City did not.[1]

---

[1] For instance, Mr. Bouza points out that out of more than 100 cases of alleged abuse emanating from Area 2, the City imposed discipline in only case (Burge in the Andrew Wilson case) and that was only after 20 years and a jury verdict. E.g., Exhibit A, ¶¶ 2-3.

2

Thus, contrary to the critical premise in the City's argument, Mr. Bouza does not purport to be relying on the truth of what is alleged; instead, he claims that the Department's response (or rather, non-response) evinces a dangerous custom and practice which could lead to the sort of abuses which befell Mr. Evans. Consequently, the City's refrain about 93 "mini-trials" or weeks/months of additional discovery and testimony about whether any particular victim really was framed falls totally flat. The problem for the City's argument is that Plaintiff has structured his claim to avoid the posited doomsaying scenario. Plaintiff's total evidence on this claim (which also relies on the Defendants' Fifth Amendment assertions when asked if there was such a practice) amounts to less than even a single day of trial testimony, primarily from Bouza. The limited evidence that the City has mustered to rebut the proposition that homicide detectives in Area 2 had the opportunity to run wild and abuse suspects in the 1970s without any fear of genuine discipline cannot take much longer than that to present either.

The City's argument must thus be seen for what it truly is: an attempt to strike otherwise valid evidence from the record on the ground that it is too wide-ranging and extensive for the City's taste. There is no justification -- legal or logical -- for the City's position.

Indeed, one cannot help but notice the blatant irony in the City's position. With respect to Plaintiff's other policy claim (street files), the City contends that summary judgment is appropriate because *he supposedly has not offered enough examples of other victims*. For instance, the City's summary judgment Reply argues on the street files point that Plaintiff should lose because "Plaintiff relies exclusively on the facts of the lone case [Jones]."[2] Then, on the

---

[2] This argument, too, is flawed. The Jones street file happens to be the one and only street file still in existence -- and it was not destroyed with the others only because the Jones plaintiff's lawyers saved their copy. Despite Judge Shadur's order in Palmer that the other 300 known street files be preserved, they no longer exist. Thus, when it came time for discovery in this case, the
(continued...)

3

other practice claim, the City turns around argues the opposite, namely, that Plaintiff has offered too many examples of serious police abuses. The world obviously would have been better off if there had been less victims, but Plaintiff cannot be penalized just because the Defendants victimized so many others in the way that they victimized him. If the Defendants had any caselaw for the proposition that a Monell claim fails (or is too cumbersome to survive) because there are too many victims, they certainly have not cited any.

### B. The City's Argument That These Witnesses Were Not Disclosed Is Simply Wrong

Reading the City's motion to strike, the Court is undoubtedly left with the distinct impression that Plaintiff never disclosed to the City during discovery that he intended to rely on the evidence cited in his Local Rule 56.1 Statement of Additional Facts. The Court will likely be disappointed to learn that the City's argument is misleading at best. On April 14, 2005, Plaintiff made clear in a letter that:

> As for the alleged policy and practice of framing innocents, to be clear, Plaintiff adopts all of the documents and disclosures produced to and by Mr. Noland's firm in the four Area 2 cases. As far as Plaintiff is concerned, given that the Dykema firm is litigating both cases for Chicago, everything produced and disclosed in those cases is fair game here too.

See Exhibit B. Moreover, the City's attorney explicitly acknowledged this letter and Plaintiff's

---

(...continued)
City was unable to produce any of the disputed 300 files, much less even a list of which cases they were associated with. It is thus inaccurate to argue, as the City does strongly, that there is nothing exculpatory in the remaining 300 files. The most that the record establishes is that, as noted in the Palmer II language upon which the City so heavily relies, plaintiff's counsel in Jones did not locate any. There is nothing whatsoever to support any inference, however, that they ever once bothered to check; on the contrary, these attorneys apparently stopped pursuing the Palmer litigation sometime after the City adopted the new general order concurrent with Judge McMillan's T.R.O., and the case was dismissed for want of prosecution. In any event, as argued in Plaintiff's Response to Summary Judgment, there is nothing about the holding of Palmer II which bars Plaintiff from relitigating the question here, and the summary judgment record more than corroborates the practice of withholding material evidence in undisclosed street files.

4

position. See Exhibit C (objecting, but nonetheless acknowledging that the City was on notice).[3] In fact, in a moment of candor, the City's present motion admits: "[T]o the extent Plaintiff identified these individuals in discovery. . . plaintiff identified them as alleged victims of 'abuse' and 'police torture at Area 2'. . ." See City's Motion to Strike at 5. See also id. at 7 n.2 (drawing an untenable dichotomy: "Plaintiff failed to *disclose* these 93 persons as witnesses, [but] to the extent that he *listed* them in discovery. . .") (emphasis added).

Thus, contrary to the unmistakable insinuation in the City's motion, there is actually no dispute that the evidence sought to be stricken was in fact disclosed. And not only that, but this very same set of roughly 100 victims has *already been the subject of years of discovery in the other Area 2 abuse cases*, several of which were pending even before this case was filed. Indeed, the very same firm representing the City here has already spent huge sums (the total of all firms' defense fees in the other four Area 2 cases--not including this one --was approaching $4 million, according to press accounts, see Exhibit D) litigating the very same issue which defense counsel now claims before this Court to have been ambushed and denied all opportunity to discover.

None of that is meant to cast aspersions on defense counsel; they surely deserve to be paid for all of their hard work. Plaintiff's only point here is that it is disingenuous to suggest that defense counsel needs years of additional discovery if Plaintiff's policy claim is permitted to proceed given that defense counsel has been vigorously engaged in that very same discovery for quite a long time already. See City's Motion to Strike at 3 n.1 (admitting that "[a]llegations of police torture at Area 2 are currently being thoroughly litigated [by the same defense firm as this case] in three cases pending before other judges in this district"); see also id. at 7 (the City

---

[3] In the Hobley case, Plaintiff's counsel agreed to the same limitation adopted here, namely, that he intends to present the evidence relating to these witnesses via expert testimony summarizing the record rather than attempting to call each of the witnesses at trial.

5

"subpoenaed much of this material [relating to the 100 identified victims] 9 months ago, but are still waiting. . ."). The Court should thus reject the City's misguided insistence that denial of summary judgment somehow entitles the City to avoid the January 2006 firm and final trial date by opening the door to "conservatively" (in the City's word) several hundred more depositions. See Motion to Strike at 7 (arguing unpersuasively that if summary judgment is denied, the City should be given a full year of additional discovery).

There is a final point to be made regarding the City's suggestion that the Plaintiff did not disclose the evidence at issue. Again, the irony is that it is the City, not the Plaintiff, who did not timely disclose the evidence relied upon relating to this policy claim. Specifically, less than two weeks before filing its summary judgment motion, after more than a year of intensive litigation, the City delivered to Plaintiff's counsel a small box of documents relating to things such as training policies and disciplinary statistics. See Plaintiff's S.J. Exhibit 42 (letters from the City disclosing this new evidence on the eve of the already-extended discovery cut-off). The City then turned around a few days later and moved for summary judgment on the basis of these belatedly-disclosed documents. See City's S.J. Mem. at 12-13 (relying on disciplinary statistics and training policies). The point is, it is the Plaintiff who should be arguing about disclosure problems, not the City.[4]

---

[4] Because of the belated disclosure, Plaintiff had no opportunity to test any of this evidence during discovery, such as asking the Defendants whether they received training consistent with the newly-disclosed official policies. Furhter, Plaintiff has no way to reconcile the discrepancy between these new statistical documents (showing that officers were disciplined at such and such a rate) with the evidence amassed in this record that not a single officer was ever once disciplined -- or even heard of anyone ever being disciplined -- for abusing suspects during interrogation.

### C. Equally Unavailing Is The City's Argument That Many Of These Victims Post-Date The Evans Abuse

As the Court is aware, Mr. Evans contends that his injuries were caused, at least in part, by the deliberate indifference of the relevant policymakers to the practice of framing people by Area 2 homicide detectives. Put simply, there was a disturbingly widespread custom of making the crime fit the suspect, rather than the other way around. People were beaten and abused (as Mr. Evans was), interrogations were coercive (as was true for a number of the Evans witnesses) and evidence was fabricated, including false and fabricated confessions (as one was fabricated here). Meanwhile, no police officers were ever held accountable for these rampant abuses, leading all of them to believe they could cross the line in terms of abusive practices with total impunity. Much later, the problem was addressed when Commander Burge was fired, but not before Mr. Evans was victimized by the practice of these rouge Area 2 detectives.

While Plaintiff has proffered at least five examples of similar abuse that pre-dated Mr. Evans' arrest, the City points out that much of the evidence proffered in support of the policy comes after Mr. Evans' abuse. This is not dispositive.

For one thing, while it is well-settled that an isolated example is insufficient to establish a practice, see Tuttle v. Oklahoma City, 471 U.S. 808 (1985), that truism merely begs the more important question of how many incidents are sufficient. The answer is that as few as "several" has sufficed for these purposes. Jeanty v. County of Orange, 379 F.Supp.2d 533, 449-50 (S.D.N.Y. 2005) (plaintiff identified "several inmates" who were allegedly subjected to similar mistreatment such that "at the very least, there is an issue of fact as to whether there is a history of [similar abuses]"). Thus, no matter what the Court ultimately rules on the admissibility of the post-event examples, summary judgment is inappropriate on the existing record.

7

Moreover, under the caselaw, the post-event examples are perfectly admissible. Under the caselaw, they can and should be considered by the Court on the question of whether there existed a previously-existing pattern and practice. See Henry v. County of Shasta, 132 F.3d 512, 519 (9th Cir. 1997) ("'post-event evidence' may be used to prove the existence of a municipal policy in effect at the time that Henry was detained"), *as amended*, 137 F.3d 1372, 1372 (9th Cir. 1998) ("we reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but may be highly probative with respect to that inquiry" and collecting cases that the policies of an institution at a particular time can be demonstrated by evidence of subsequent events); Bordanaro v. McLeod, 871 F.2d 1151, 1166-67 (1st Cir. 1989) (allowing post-event evidence of police misconduct on the grounds that "it tend[ed] to show what customs or policies were in effect in the City of Everett before the date of the attack" because "post event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation"); Grandstaff v. City of Borger, 767 F.2d 161, 171 (5th Cir. 1985) (where post-event evidence of "dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City of Borger" and thus reflected city policy). As the Grandstaff court explained:

> The disposition of the policymaker may be inferred from his [post-event] conduct *** As subsequent conduct may prove discriminatory motive in a prior employment decision, and subsequent acts may tend to prove the nature of a prior conspiracy, so the subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy.

Grandstaff, 767 F.2d at 171 (citations omitted); Bordanaro, 871 F.2d at 1166 ("subsequent acts may tend to prove the nature of the prior conspiracy, so the subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy").

8

Not surprisingly, the Seventh Circuit follows this rule that post-event action/inaction is relevant to inferring the existence of a prior policy and practice. In Sherrod v. Berry, 827 F.2d 195, 204-05 (7th Cir. 1987), *reversed on other grounds*, 856 F.2d 802 (7th Cir. 1988), for example, the Seventh Circuit cited Grandstaff with approval in upholding the decision to allow post-evidence of a subsequent lawsuit against the police officer alleging similar misconduct. See also Keys v. Harvey, 1996 WL 34422, at *4 (N.D.Ill. Jan. 26, 1996) (recognizing that Sherrod stands for the proposition that the Seventh Circuit follows the rule of Grandstaff concerning the admissibility of evidence of inadequate discipline for post-event police misconduct). Cf. Tuttle v. Oklahoma City, 471 U.S. 808, 809-10 (1985) ("A §1983 cause of action is as available for the first victim of a policy or custom... as it is for the second and subsequent victims").

Numerous other decisions support the admissibility of the post-event abuses and the failure to discipline them as evidence from which a prior practice can be inferred. Montalvo v. Hutchinson, 837 F.Supp. 576, 581 (S.D.N.Y.1993) (permitting discovery into post-event police misconduct because "[e]vents after a disputed incident often shed light both on the intent of participants, and on institutional or individual patterns of behavior. Depending on the precise circumstances involved, such post-incident occurrences can be highly relevant"); Ismail v. Cohen, 899 F.2d 183, 188 (2d Cir. 1990) (affirming decision to admit evidence about subsequent police abuse in order to show "pattern, intent, absence of mistake, etc."); Gallagher v. City of West Covina, 2002 WL 1836300 (C.D.Cal. Aug. 2, 2002) ("The government's reaction to incidents involving its police is important evidence of the policy... [and e]vidence of a post-incident coverup is relevant to Plaintiff's Monell claim. The Court finds that its prejudicial impact would not substantially outweigh its probative value.") (citing Grandstaff); Larez v. City of Los Angeles, 946 F.2d 630, 645 (9th Cir. 1991) (where allegation was that police chief set

9

tone condoning and encouraging excessive use of force, "we can hardly think of better evidence" than statements he made after incident that were consistent with those claims); Martinez v. Cornell Corrections of Texas, 229 F.R.D. 215 (D.N.M. 2005) (permitting discovery of post-event police abuses based on the relevance theory espoused in Grandstaff and cases like it); Malsh v. New York City, 1995 WL 217507 (S.D.N.Y. April 11, 1995) (same).

Thus, contrary to the City's suggestion, there is no bright line rule that post-event incidents are irrelevant. See also Missouri, Kan. & Tex. Ry. v. Williams, 103 Tex. 228, 125 S.W. 881, 882-83 (1910) (providing a classic statement of the evidentiary principle that "[w]hen the question is as to a condition existing at one time, evidence as to that at a different time" may or may not be probative, depending on whether the condition is "ephemeral" or "permanent or lasting"). Where, as here, the post-event evidence permits an inference of a pre-existing policy and practice, the evidence is admissible. Foley v. City of Lowell, 948 F.2d 10, 13-14 (1st Cir. 1991) (upholding admission of testimony of a series of witnesses about police abuses, including after the event because "[c]ontrary to the City's exhortation that the date an incident occurs marks the outside date for evidence-gathering on the such an issue, we think that actions taken subsequent to an event are admissible if, and to the extent that, they provide reliable insight into the policy in force at the time of the incident"), citing United States v. Mena, 933 F.2d 19, 25 n.5 (1st Cir. 1991) ("events that occur after an offense has been perpetrated may be relevant in an assessment of what transpired at the earlier time").[5]

---

[5] The case upon which the City relies, Calusinski v. Kruger, 24 F.3d 931 (7th Cir. 1994) is distinguishable. For starters, plaintiff there neglected to plead a Monell claim, so the discussion was purely *dicta,* but more to the point, the plaintiff there offered nothing but one single post-event incident to support his premise of a pre-existing pattern. The court did not say that post-event incidents were never relevant, and it expressly allowed that the sometimes they could be.

10

### D. The Fact That Plaintiff Cannot Recover Damages For The Time-Barred Physical Abuse Does Defeat Plaintiff's Policy Claim For Due Process And Equal Protection Violations

On this point, the City is grossly overplaying its hand. It is true that this Court has determined that Mr. Evans cannot recover damages for any physical abuse because such claims are not rescued by Heck, and are thus time-barred. See 8/29/05 Mem. Op. at 12-14. Contrary to the City's argument, however, the fact that Mr. Evans cannot recover damages for this abuse is not the same thing as a conclusion that the alleged misconduct is irrelevant to all of the remaining issues in the case. The latter does not follow from the former, as Judge Bucklo explained in the context of denying a motion *in limine*:

> [T]he dismissal of a claim for relief under §1983 does not mean that all evidence which formed the basis for such a claim is inadmissible [at trial]. I grant motions *in limine* to exclude evidence only if the evidence sought to be excluded is clearly inadmissible for any purpose. [Cites]. Generally, [even without a claim for false arrest], the circumstances surrounding an arrest or detainment are relevant both to whether it was lawful and the damage calculation resulting from an unlawful arrest.

Robinson v. Village of Matteson, 1999 WL 1270685, at *2 (N.D.Ill. Dec. 23, 1999).

To illustrate this point more concretely, consider the City's argument about the dismissal of the physical abuse claim in Hobley v. Burge, 2004 WL 2658075 (N.D.Ill. Oct. 13, 2004), a case being pursued and defended by two of the firms litigating this case. As the City correctly notes, Judge Aspen reached the same conclusion this Court did, namely, that the excessive force claim was time-barred given that Mr. Hobley, like Mr. Evans, denied that he had ever confessed.

After that, however, the City's argument breaks down. Contrary to the argument presently being espoused by the City, Judge Aspen's opinion specifically recognizes that the physical abuse, while not actionable in its own right, still remains part of the case. For example, in the very same opinion that Judge Aspen dismissed the torture claim as a theory for damages, he also

relied upon the very same evidence in dispute here to conclude that Plaintiff's equal protection claim (and Monell claim relating to the same) remained viable:

> Hobley provides a list of 69 individuals, including himself, who were alleged victims of serious police misconduct... Assessed merely on the pleadings, the instant case meets this standard [to prove an equal protection claims], as the plaintiff contends that 'of all of the 100+ examples of Area 2 police torture cases known to date, all of this torture was reserved (with only one exception) exclusively for black suspects, and all of the torturers were white.' Accordingly, we find that Hobley has satisfactorily alleged the element of discriminatory intent.

Hobley, 2004 WL 2658075, at *11-*13.[6]

Thus, though Judge Aspen barred the torture claim as time-barred, the court did not hold that these other examples of people "who were alleged victims of serious police misconduct" are therefore somehow irrelevant to the case. Far from it, Judge Aspen specifically held that the evidence remains relevant to prove other claims.

Applying that same reasoning here, Plaintiff's reliance on these "alleged victims of serious police misconduct" (to use Judge Aspen's term) is not, as the City insists, an attempt to "evad[e]" this Court's ruling on the physical abuse claim. The fact that evidence is admissible on one claim (*i.e.*, a barred claim) simply does not mean that the same evidence cannot be relevant to other claims (*e.g.*, the widespread practice of violating due process and/or equal protection).

And it is obvious here that the evidence does suffice to overcome summary judgment. What these 93 allegations establish (or, more accurately, what the expert testimony relying on these 93 allegations establishes) is that homicide detectives in Area 2 had every reason to believe that they could commit "serious police misconduct" without fear of consequences. This is sufficient for purposes of Rule 56. See Jeanty v. County of Orange, 379 F.Supp.2d 533, 449-50

---

[6] In the Evans case, the fully-developed record now more than backs up the allegations from the pleadings. In fact, in part because of the Special Prosecutor's investigation, the number of known and documented victims has grown from the 69 listed in Hobley to the 93 corroborated here.

12

(S.D.N.Y. 2005) (implicitly rejecting the county's argument that the Monell evidence involved "different witnesses, different factual circumstances, [and] different claimed injuries. . ." from the plaintiff's claim of police abuse).

The City also argues that the evidence sought to be stricken concerning the disputed policy (police abuses in terms of framing criminal suspects without regard to guilt or innocence) is not, in the City's view, sufficiently similar to what Plaintiff alleges. This argument, too, is unavailing. The evidence in the record establishes a widespread practice of criminal police abuse directed at criminal suspects, as well as a total indifference to the same, and the law is clear that "[a]s long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990) ("a sufficiently close causal link between a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom"). Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1990) ("To the extent that the 'causal link' is not too attenuated, the jury must decide whether the government policy or custom proximately caused the constitutional violation").[7]

---

[7] Finally, the City argues incorrectly that Plaintiff's evidence should be stricken as "conclusory." The flaw in the City's reasoning is that there is nothing wrong with distilling the evidence to its most relevant essence for purposes of Local Rule 56.1. The summary in each paragraph contains the relevant facts, nothing more, but nothing less; not surprisingly, the City cites no caselaw in support of its contention that this is a grounds to strike anything. Indeed, had Plaintiff instead broken out each fact pattern into particularized details, the City would undoubtedly be making a contrary argument that the victims are too disparate to overcome summary judgment.

## Conclusion

As the Court pointed out at the initial hearing on this motion to strike, when the City moved for summary judgment, it had to expect that Plaintiff was going to rely on the contrary witnesses and evidence which was disclosed during discovery. That is all Plaintiff is doing here. It is hardly Plaintiff's fault that there are so many similarly-situated victims, and the Court should reject the City's implicit argument that the case would be simpler if the City wins this motion. That is simply not a valid ground to strike evidence, and both the City's motion to strike and related motion for summary judgment should be denied.

RESPECTFULLY SUBMITTED:

_____
Attorneys for Plaintiff

Arthur Loevy
Jon Loevy
Mike Kanovitz
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
(312) 243-5900

Locke Bowman
MACARTHUR JUSTICE CENTER
University of Chicago Law School
1111 East 60th Street
Chicago, IL 60637

Karen Daniel
Center on Wrongful Convictions
BLUHM LEGAL CLINIC
Northwestern University School of Law
357 East Chicago
Chicago, IL 60611

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL EVANS, | ) | |
| | ) | |
| Plaintiff, | ) | 04 C 3570 |
| | ) | |
| v. | ) | Judge Coar |
| | ) | |
| CITY OF CHICAGO, et al. | ) | Magistrate Judge Nolan |
| | ) | |
| Defendants. | ) | |

## NOTICE OF FILING

TO:

| | |
|---|---|
| Locke Bowman | Karen Daniel |
| MacArthur Justice Center | Northwestern University |
| University of Chicago | 357 East Chicago |
| 1111 East 60th Street | Chicago, IL 60611 |
| Chicago, IL 60637 | |
| | |
| Terrence M. Burns | Andrew W. Hale |
| Harry N. Arger | Kevin W. Horan |
| Daniel M. Noland | John J. Rock |
| Dykema Gossett et al. | Rock Fusco & Garvey, Ltd. |
| 10 S. Wacker, Ste. 2300 | 350 N. LaSalle, Ste. 900 |
| Chicago, IL 60606 | Chicago, IL 60611 |

Please take notice that on October 26, 2005, I filed the attached PLAINTIFF'S RESPONSE TO THE CITY'S MOTION TO STRIKE at the United States Courthouse, 219 South Dearborn, Chicago, IL.

LOEVY & LOEVY
312 North May, Ste. 100
Chicago, IL 60607

## CERTIFICATE OF SERVICE

I, Jon Loevy, an attorney, certify that on October 27, 2005, I delivered a copy of the attached Response to the above-named parties of record via U.S. Mail.