# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL EVANS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.   04 C 3570** |
| **v.** | ) | |
| | ) | |
| **CITY OF CHICAGO, Present and Former** | ) | **HONORABLE DAVID H. COAR** |
| **Chicago Police Officers ANTHONY** | ) | |
| **KATALINIC, FRED HILL, WILLIAM** | ) | |
| **MOSHER, JOHN McCABE, THOMAS** | ) | |
| **McKENNA, DENNIS BANAHAN, JOSEPH** | ) | |
| **DiLEONARDI, JOHN GRIFFITH,** | ) | |
| **RICHARD O'CONNELL, PETER** | ) | |
| **DIGNAN, THOMAS FERRY, PATRICK** | ) | |
| **McGROARTY, JOSEPH DiGIACOMO,** | ) | |
| **ROY MARTIN, EDWARD LERACZ,** | ) | |
| **DANIEL SWICK, and JOHN E. RYAN** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER[1]


## I.    BACKGROUND

During the evening of January 14, 1976, a nine-year-old girl named Lisa Cabassa

disappeared while walking home alone in her southeast Chicago neighborhood. Her body was

found early the next morning in an alley a number of blocks away. She had been brutally raped

and murdered.

---

[1] The caption has been amended to reflect that Plaintiff voluntarily dismissed the claims
against individual defendant Paul Nealis. (Pl.'s Resp. To Pol. Ofcr. Defs. Mot. for Summ. J., at
18 n.7.)

The Cabassa case generated media attention and was the subject of several articles in local newspapers. The Area 2 division of the Chicago Police Department began an investigation. A group of South Side organizations jointly offered a $5,000 reward to anyone with information that could lead to the arrest and conviction of the murderer. The reward offer was publicized in the Chicago-area media.

Five days after the murder, on January 19, 1976, a South Side resident named Judith Januszewski called Frank Martin, whose name she read in an article about the reward in the *Daily Calumet* paper. Januszewski worked as a secretary/receptionist at a real estate office on East 87th Street in Chicago. At the time, Januszewski, her husband, and their two young children lived at 85th Street and Saginaw Avenue, only a few blocks from where Lisa Cabassa last had been seen. When she called Martin, Januszewski and her husband's financial situation was "mediocre at best." (Januszewski Dep. at 363.) Januszewski did not call the police.

After her call to Martin, the Chicago police arrived at Januszewski's home and took her to the Area 2 police station. Chicago Police Officer William Mosher questioned Januszewski on January 19 and into the morning of January 20, 1976, and typed up a written transcript of the interview, also dated January 20, 1976. Januszewski reported that on January 14, 1976, she left work "at approximately 6:37 p.m." and began to walk to her home at 85th Street and Saginaw Avenue. (Pol. Ofcr. Defs.' L.R. 56.1 Stmt., Exh. 17.) She walked east on 87th Street and turned north on Saginaw. She passed her mother's house on Saginaw, where she saw her mother standing on the front porch. When she approached the corner of 86th Street and Saginaw, she stated that she heard voices. Looking west towards Colfax Avenue, she said she saw two young black men "struggling with a young girl." *Id*. The girl and the two men were "on the south side

of 86th Street about 75 to 100 feet west" of Januszewski. *Id*. Although it was evening and dark outside, Januszewski stated that the lighting in that area was "good." According to the transcribed statement, the men each had the girl "under the arms" and were trying "force her to do something she didn't want to do." *Id*. The girl was struggling and Januszewski stated that she "heard her say distinctly, 'No'." Januszewski then "ran home." (Pl.'s L.R. 56.1 Stmt., Exh. J.)

The statement recounts that Januszewski described the girl as "dark skinned," "of gramm[a]r school age," and wearing a checked or printed coat. Januszewski described the first man as between 19 and 25 years old, approximately 5 feet 11 inches, "medium brown complected," and wearing a hat and a "dark maxi-coat." She described the second man as also between 19 and 25 years old, about 5 feet 11 inches, "slim build like the first one," "medium brown complected," and wearing a dark waist-length, possibly leather jacket, dark trousers, brown shoes with "very big" white platforms. In addition, the second man had "very black eyebrows" which "almost looked like they were painted," and a slight moustache. *Id*. Januszewski, who wore glasses in 1976, was not wearing glasses as she walked home. According to Harry Januszewski, Judith's ex-husband, Januszewski did not see well without her glasses.

The police officers took Januszewski to the home of a police artist, who drew a composite sketch of the two men based on Januszewski's description. The sketch was published as part of a Chicago Police Department ("CPD") Special Bulletin on January 27, 1976. After leaving the sketch artist's home, the officers took Januszewski back to the police station, although it was now late in the evening. They placed her in an interrogation room, which she was not allowed to leave. Although she had two young children at home, she stated that the police did not permit her to call her house. Instead, the officers, including Officers Ferry,

Katalinic, Hill, and McKenna, continued to question her and ask her to name the persons she said she had seen. Januszewski repeatedly stated that she did not know the names of the men. Januszewski was not permitted to leave the police station until early in the morning of January 20, 1976.

Details of Story Change

The substance of Januszewski's January 19 interview was reported a second time in a supplemental report written by Chicago police officers Anthony Katalinic and Fred Hill on February 6, 1976. The February 6 report contained several significant differences from the January 20 report. According to this report, Januszewski told the police that on the night of Lisa Cabassa's disappearance, she was walking home from work shortly after 8 p.m., rather than at 6:37 p.m. As she approached 86th Street from Saginaw Avenue, she stated that she saw two black men between the ages of 18 and 23, pulling a young girl toward an alley at 86th Street and Saginaw Avenue. The men were each holding one of the girl's arms but the girl appeared to be resisting. According to the supplemental report, Januszewski described both men as medium complected and with thin builds. In this description, the first man was wearing a dark, dirty and wrinkled maxi coat, and the second man had eyebrows "so neatly defined that there is a possibility that the brows may have been penciled over." (Pol. Ofcr. Defs.' L.R. 56.1 Stmt., Exh. 19.) In the February 6 report, Januszewski is reported to have stated that she saw a third black man that night, who was standing between her and the two men with the girl and watching them. This third man was known to Januszewski, according to the supplemental report, as "Earl Jones"; she had become acquainted with him over the course of a year because occasionally he would stop by the realty where she worked and speak to her and her co-workers.

In addition, according to the February 6 report, Januszewski did not get a good look at the little girl's face. She did not tell the police that the girl on the corner was Lisa Cabassa, although she knew Lisa Cabassa by name because her children played with Lisa. She told the police she was not sure if what she saw was the abduction of Lisa Cabassa or rather "an older brother bringing his sister home." (Pol. Ofcr. Defs.' L.R. 56.1 stmt, Exh. 19.)

Januszewski's Deposition

Januszewski testified at her deposition that the police asked her if she knew the name of the persons she saw on the corner and that she answered "no." She also stated that she believed the police did not find her response credible. Between January 19 and February 26, 1976, Januszewski met with CPD officers, including Officers Katalinic, Hill, McKenna, and Banahan, on at least ten occasions, at her home, her office, or the police station. She viewed mug shots, yearbooks, photographs, and line-ups on multiple occasions in an effort to identify the men she saw on the corner. CPD officers showed her multiple photos or asked her about specific individuals, suggesting names to her as being the men on the corner. Januszewski stated in her deposition that she was "quite sure" the police officers said the name "Michael Evans" before she ever identified Evans as one of the men she saw. (Januszewski Dep., at 51.) At no point during January or early February 1976 did Januszewski tell the CPD officers that she knew the name of either of the two men she said she saw on the corner. She also did not tell her husband, her mother, or her small circle of friends that she knew the name of either of the men she saw with the girl.

<u>Harry Januszewski's Concerns About His Wife's Credibility</u>

Januszewski's husband testified at his deposition that he was suspicious of his wife's involvement with the police. He stated that he attempted to let the police know that his wife was not always truthful and inquire if the police were sure they knew what was going on with her. Harry Januszewski testified that Judy had previously claimed to have been mugged on her way home from cashing a check, only later to admit that she had simply kept the money for herself. He stated that on another occasion, she had held a demonstration party in their home and took orders for some kind of product from her friends. When the product never arrived, Harry repaid the friends out of his pocket. He did not know what Judy did with the money. Harry Januszewski did not tell the police of these incidents at the time because they assured him that everything was "fine." When police or prosecutors met with his wife at their house, Januszewski stated that he was locked out of the room and was unable to raise his concerns with them. In addition, he accompanied Judy to court on one of the days she was scheduled to testify but Officers Katalinic and Hill kept him away from the proceedings by confining him in a holding room, with a uniformed police officer standing outside the door, until the trial had adjourned for the day.

<u>Januszewski Names Evans</u>

Beginning in late January or early February 1976, Januszewski also began to report incidents of alleged harassment to the police. In total, Januszewski reported ten incidents of harassment or intimidation to the police between January and May 1976. The incidents included harassing telephone calls, threatening messages, and attempted home invasion. The police did not find the person or persons responsible. More than half of the alleged incidents occurred after Plaintiff had been arrested and was in State custody. At some point on or about February 25,

1976, Januszewski called the police to report that she had heard someone banging on the side of her house. Januszewski said that she recognized the person who banged on her house as the person she called "Earl Jones." When she went and looked into the gangway on the north side of her building, she claimed she saw an object. The police officers who responded to the call found an empty wine bottle with a note and a .25 caliber bullet taped to the outside. According to the police report, "the reporting officers were unable to read the note and are unaware of its contents specifically." (Pol. Ofcr. Defs.' L.R. 56.1 Stmt., Exh. 26.)

The report further stated that Januszewski told the officers she wished to "clear the air," and stated that one of the men she had seen on the corner was a young man from the neighborhood who was known to her as Michael Evans. Januszewski also reported that she had received threatening phone calls at home and at work, telling her not to talk to the police[2]; she stated that she recognized the caller as Michael Evans.

At Evans' second criminal trial, Januszewski stated that she called the police about the banging on her house and then, "later that night," gave them the name of Michael Evans. At her deposition, however, Januszewski testified that she could not remember when she first provided Michael Evans' name to the CPD or where she was when she did so. Sergeant Ferry testified at his deposition that he and another officer spoke with Januszewski shortly before Evans was arrested, and she told him that she was frightened and wanted protection for her family and financial assistance for moving expenses.

---

[2]  Neither party produced evidence that the CPD contacted the telephone company or otherwise investigated the alleged threatening phone calls to Januszewski.

Michael Evans

Michael Evans was 17 years old in February 1976. He lived with his parents and sisters on the same street as Judith Januszewski's mother, approximately half a block away. He had never been arrested before and had no criminal record. He and Januszewski were acquainted because Evans occasionally stopped by the realty office where she worked to visit with one of her co-workers, Richard Dabney. Evans told the police that he occasionally had called the real estate office where Januszewski worked as a secretary/receptionist to speak to Richard Dabney. Evans had seen Lisa Cabassa playing with other children around the neighborhood and knew her name.

On the morning of February 26, 1976, Michael Evans walked from his home in the direction of Boyd's Store on 87th Street. When he reached the Lamplighter Realty, Januszewski, who was inside with Officers Katalinic, Hill, and others, pointed him out to the officers. Evans was arrested on the street outside the realty office and immediately placed in a police car and taken to the Area 2 station. Evans testified at his deposition that one of the arresting officers said he hoped Evans would run so that he could shoot Evans' "damn brains out." (Evans Dep., at 48.) At Area 2, Evans was placed in an interrogation room where he was shackled to the wall at various points, and interrogated over the course of the morning, afternoon, and evening. During the course of his interrogation, Evans supposedly confessed to the murder then recanted his story. Evans was not allowed to make a telephone call or to see his mother, who was at the station for over 12 hours, trying to see him. At approximately 9 p.m., Evans gave a court-reported statement to Assistant State's Attorney Thomas J. McCarthy; the statement was 54

typed pages. The statement reflects that the ASA did not question Evans about his supposed confession nor ask him anything about the abduction, rape, or murder of Lisa Cabassa.

Januszewski also was taken to the Area 2 police station on February 26, 1976, at approximately 9:30 a.m. She was kept in a cockroach-infested interrogation room until late in the evening. Despite her requests to leave, she was not allowed to go home. During this time, she was not allowed to leave the room, did not use the restroom, and was given only one meal, which she was unable to eat because of the roaches. Officers Katalinic, Hill, and McKenna, among others, met with her during this time to ask her, again, to provide information about the people she saw on the corner. Januszewski stated that Evans had been placed in the interrogation room next to hers; she could hear people yelling at him over the course of the day and could hear his voice answering softly.

On February 27, 1976, Michael Evans appeared before Judge Maurice Pompey to be formally charged and to have a bond hearing. At that time, the judge directed that the mittimus transferring Evans to jail be marked "hospital" so that Evans could be immediately examined for physical injuries sustained in his arrest and interrogation. Despite this order, Evans was not taken to the hospital and, in fact, never was examined by a medical professional.

Evans' First Trial

In June 1976, in a bench trial, the State prosecuted Evans for the rape and murder of Lisa Cabassa. Prior to trial, Evans moved to suppress his arrest, but this motion was denied. Evans also moved to suppress the witness identification but apparently this motion was denied without

prejudice.[3] Judith Januszewski was the only witness against Evans. Januszewski stated at her deposition that she did not want to testify and had told both the police and the State's Attorney that she was unwilling to do so. The police officers, however, told her that Evans had confessed and that they had other witnesses. Neither of these statements was true. "The prosecution's case rested entirely on the testimony of Ms. Januszewski." (Indiv. Ofcrs. Resp. Br. at 1.) Evans' attorneys argued at trial that the police had manipulated Januszewski into identifying him as one of the men she saw, and that police had manipulated members of the Cabassa family into changing their account of the time of Lisa Cabassa's disappearance so that it fit Januszewski's testimony. According to the youth division officer who took the missing persons report from the Cabassa family, Carmen Cabassa, Lisa Cabassa's mother, initially reported that she had last seen her daughter at 6:30 p.m. At the Plaintiff's state criminal trials, however, Cabassa testified that the last time she saw her daughter was approximately 8 p.m. In addition, Januszewski's trial testimony differed from the information she had given the police prior to Evans' arrest. For instance, at trial she testified that she was 10 to 20 feet away from the two men on the corner, rather than 75 to 100 feet as she had told police. She also testified that the third man present was within two feet of her, although she had not told the police that fact. Judge Earl Strayhorn found Evans guilty at the close of trial. Only after Evans was convicted did defense counsel learn that Januszewski had contacted the reward hotline rather than the police, and that Januszewski had received a $1,250 cash payment from the Illinois Law Enforcement Commission for alleged relocation expenses when she named Michael Evans. Because these disclosures should have

---

[3] The evidence for this is a notation on Judge Strayhorn's "Court Sheets" for June 7, 1976. There is no indication of whether oral arguments were heard or what the basis for the judge's ruling was.

been made prior to trial but were not, Judge Strayhorn found that the prosecution had violated

Evans' right to a fair trial under *Brady v. Maryland*, 373 U.S. 83 (1963), and *United States v.*

*Agurs*, 427 U.S. 97, 106-107 (1976). On September 27, 1976, Judge Strayhorn therefore granted

Evans' motion for a new trial.

Police Investigation Continues

Between the vacation of Evans' first conviction and the commencement of his second

trial, the Chicago Police Department continued to investigate the Cabassa murder. At 11 p.m. on

November 16, 1976, police and prosecutors met with a 16-year-old African-American youth

named Keith Jones, whose mother had contacted Evans' counsel to say that Jones had

information about the murder. The police had picked Jones up from his home on the South Side

earlier that day and questioned him alone in an interrogation room until the late evening. At his

deposition in this case, Jones stated that the officers threatened to "nail [his] little ass up against

the wall" and told him that he would go to jail for 100 years if he did not give a statement

describing how Evans committed the murder with Earl Jones. (Pl.'s L.R. 56.1 Stmt., Exh. S, at

23.) They showed him photographs of Lisa Cabassa's body, and photographs of people they

stated were connected with the crime, at least one of which was labeled with the name "James

Earl Jones." In a 13-page detailed typewritten statement given to an Assistant State's Attorney,

Jones stated that Evans and a man named James or Earl committed the murder, that he saw Lisa

Cabassa's body in the alley behind Evans' house, and that Columbus Thomas, who was Michael

Evan's cousin, and Sam Parker, both of whom were friends of Michael Evans, were also in the

alley. On November 17, 1976, Officers McKenna, Katalinic, Nealis, Martin, Hill, and

DiGiacomo arrested Paul Terry, Columbus Thomas, and Sam Parker. Terry was charged with the rape and murder of Lisa Cabassa; Thomas and Parker were charged with concealing a homicide.

On December 1, 1976, Keith Jones met with Alan Blumenthal, one of Michael Evans' defense attorneys, and gave a 62-page court-reported statement in which he completely recanted the statement he had given to the police. Jones described coercion, intimidation, and threats of physical violence by the police; he recounted how he had been coached to give the statement they wanted and shown photographs of Lisa Cabassa's body and of men the police said possibly were involved. A December 29, 1976 article in the *Chicago Tribune* reported that the state dismissed charges against Columbus Thomas and Sam Parker because Keith Jones recanted his statement to police. The State did not call Jones as a witness at Evans' second trial.

Judith Januszewski, who had identified a man she knew as "Earl Jones" as being the third man on the corner on January 14, 1976, told police that Earl Jones had been following her in a white car. She gave police the license plate number of the car. The white car then was traced to a South Side resident in Januszewski's neighborhood named James Davis, not Earl Jones. Based on Keith Jones' police statement and Januszewski's license plate information, police officers went to the home of James Davis, who lived at 81st and Saginaw, to speak to him. Davis was not home. On the morning of November 17, 1976, James Davis went to the Area 2 station, where Officers McCrae and Dioguardi, with the approval of their supervisor, Sergeant O'Connell, arrested him. Davis denied any knowledge of the other people who had been arrested; he said he had seen Michael Evans on the news but did not know him personally. Davis stated that he had never used or been known by the name "Earl Jones," that he had never met Januszewski and did not know who she was, and certainly had never intimidated her. In addition, Davis denied

knowing Evans or his friends. On the day of trial, the State dropped the murder charges against Davis.

Evans' Second Trial

In 1977, Evans was retried before a jury. In his second trial, he had a co-defendant, Paul Terry, who was alleged to be the second man Januszewski had seen on the corner on the night of the murder. Evans again argued that the police had manipulated Januszewski and members of the Cabassa family to get their accounts of events to mesh. Evans and Terry were convicted and each sentenced to 400 years in prison.

DNA Exoneration

On October 24, 2001, Evans, represented by the Bluhm Legal Clinic and Northwestern University School of Law, filed a motion for DNA Testing in the Cook County Circuit Court. DNA testing was conducted at Orchid Cellmark Laboratories. The results of this testing excluded Michael Evans and Paul Terry as the source of the DNA on the rectal swab taken from Lisa Cabassa. Evans' and Terry's convictions were vacated on May 23, 2003. The Cook County State's Attorney, on August 22, 2003, dropped all charges against both Terry and Evans. On January 6, 2005, Governor Blagojevich granted pardons based upon innocence with order permitting expungement to Evans and Terry. Evans and Terry each had served 27 years in prison.

Evans filed this 14-count civil rights lawsuit against the City of Chicago and 16 individual police officers, arising from the events of the Cabassa murder and his criminal trials and conviction. Before this court are Plaintiff's Motion for Partial Summary Judgment, Police

Officer Defendants' Motion for Summary Judgment, the City of Chicago's Motion for Summary Judgment, and the City's Motion to Strike.

## II. ANALYSIS

### A. City of Chicago's Motion to Strike

As noted in this Court's ruling on defendants' motions to dismiss, the court disfavors motions to strike unless it is clear that the matter at issue has no bearing on the litigation. The City has moved to strike 117 paragraphs of Plaintiff's Statement of Additional Facts in Opposition to [City of Chicago's] Motion for Summary Judgment on the ground that the facts are improper as relating to a claim this Court dismissed in its August 29, 2005 ruling. Not only do the paragraphs at issue bear on the litigation but the City raised the same objections, in the same language, in its reply brief. The responsive pleading is, in fact, the proper place for the City to raise its objections. There is, therefore, no purpose served in duplicating those arguments in this purported motion to strike nor does the motion advance this litigation, already highly contentious, in any material way. To the extent that Plaintiff's statements of fact are unsupported by the record or otherwise inadmissible, they will be disregarded. This Court notes that Plaintiff's use of citations that fail to match the dozens of documents on the cited CD-ROM[4] rendered this Court's work rather like that of searching for the proverbial needle in a haystack. Although certainly more compact than paper documents, the CD-ROM is only as useful as its file directory. In this instance, it needlessly consumed the Court's time without advancing Plaintiff's allegations. The motion to strike is denied.

---

[4] This Court notes, with some dismay, that Plaintiff neglected to label the CD-ROM. Given the volume of paper submitted in this case to date–much less in any number of other cases on this Court's docket–clear labeling of all submissions is a necessity.

### B. Plaintiff's Motion for Summary Judgment

Plaintiff Michael Evans has moved for partial summary judgment against eight individual police officer defendants: Katalinic, Hill, McKenna, Ryan, Swick, Dignan, Leracz and DiGiacomo ("the Individual Defendants"), on Counts I (due process) and VII (conspiracy) of his Amended Complaint. Plaintiff begins by stating the obvious: that under the due process clause of the Fourteenth Amendment to the United States Constitution, criminal defendants are guaranteed a right to a fair trial. *Newsome v. McCabe*, 256 F.3d 747, 751-52 (7th Cir. 2001); *Patterson v. Burge*, 328 F. Supp. 2d 878, 889 (N.D. Ill. 2004). According to Evans, the Individual Defendants acted in ways that "made a mockery" of his right to a fair trial and led to his allegedly wrongful conviction. *Manning v. Miller*, 335 F.3d 1028, 1032-34 (7th Cir. 2004). Specifically, Evans contends that the Individual Defendants manipulated the (sole) eyewitness identification, withheld exculpatory evidence from prosecutors and defense counsel, and manipulated witness testimony. Further, because the Individual Defendants all asserted their Fifth Amendment privilege against self-incrimination at their depositions and in their answers and responses to interrogatories and requests to admit, Evans avers that a reasonable trier of fact may conclude that the Individual Defendants both violated Evans' due process rights and conspired to so violate them.

The Individual Defendants respond that Plaintiff's due process and conspiracy claims are barred by collateral estoppel arising from the state court decisions in Evans' two prior criminal trials. They admit that Evans received an "innocence pardon" from Governor Blagojevich, but assert that the pardon does not act to expunge Evans' conviction and therefore neither invalidates nor conflicts with the prior state court rulings. Further, the Individual Defendants contend that

the pardon should not act to bar application of collateral estoppel because the pardon was simply a "ministerial act." (Indiv. Defs. Resp. Br., at 5.) The Individual Defendants assert that they are entitled to qualified immunity based on their argument that Plaintiff is collaterally estopped from asserting that there was no probable cause for his arrest. In addition, the Individual Defendants opine that Plaintiff cannot identify any favorable material evidence that the State suppressed, as required under *Newsome*. Moreover, they assert that Plaintiff has failed adequately to establish a constitutional injury underlying his Section 1983 claim. Finally, the Individual Defendants contend that their invocation of their Fifth Amendment privilege is insufficient to support summary judgment for Plaintiff.

Plaintiff responds that the court in a civil case such as this must draw an adverse inference from the Individual Defendants' Fifth Amendment privilege assertion. Thus, Plaintiff contends that the Individual Defendants "have effectively conceded" that they violated Plaintiff's due process rights and that they conspired together to do so. Plaintiff argues that his pardon vacated his conviction, thereby defeating the Individual Defendants' collateral estoppel argument because there is no prior ruling left to estop his current claims. Further, Plaintiff contends that Defendants' other arguments fail for lack of support or irrelevance.

1.    Fifth Amendment Privilege

At the outset, this Court must address the effect of an assertion of Fifth Amendment privilege against self-incrimination. Plaintiff contends that in a civil case, the court *must* draw an adverse inference from a blanket assertion of privilege. This overstates the law. In *Baxter v. Palmigiano*, 425 U.S. 308 (1976), the United States Supreme Court stated that "the prevailing rule" is that "the Fifth Amendment does not forbid adverse inferences against parties to civil

-16-

actions when they refuse to testify in response to probative evidence offered against them." *Id.* at 318. In *Palmigiano*, a prisoner was confronted with incriminating evidence at a prison disciplinary hearing for allegedly inciting a disturbance, but chose to remain silent. The prison disciplinary board downgraded Palmigiano's institutional status and placed him in segregation for thirty days. The Supreme Court upheld this decision, stating that the board was not prohibited from drawing an adverse inference from the prisoner's Fifth Amendment silence when incriminating evidence also had been presented. The Seventh Circuit, in a subsequent case, noted that "[t]he rule that adverse inferences may be drawn from Fifth Amendment silence in civil proceedings has been widely recognized ... since *Baxter* was decided." *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995) (citing cases). The Seventh Circuit emphasized that Fifth Amendment silence alone was insufficient to support a finding of liability, but rather that additional evidence was required. "[T]he entry of judgment based only on the invocation of the privilege and 'without regard to the other evidence' exceeds constitutional bounds." *Id*. at 391 (quoting *Baxter*, 425 U.S. at 318). This Court declines to adopt Plaintiff's mandatory adverse inference standard and will not deem the Individual Defendants' invocation of the Fifth Amendment at their depositions to be an admission or concession of Plaintiff's claims. Thus, in order to prevail on his motion for partial summary judgment, Evans must provide additional evidence of undisputed material fact that support his claims. That evidence, if it exists, may convince the trier of fact that Defendants are liable.

### 2. Collateral Estoppel

This Court turns next to the Individual Defendants' collateral estoppel argument and looks to Illinois preclusion law to determine the effect of a prior state court judgment. 28 U.S.C.

§ 1738; *Brengettcy v. Horton*, 423 F.3d 674, 683 (7th Cir. 2005). Collateral estoppel, or issue preclusion, is an equitable doctrine. In Illinois, collateral estoppel has three elements: 1) the identical issue was decided in prior adjudication; 2) where final judgment on the merits was reached; and 3) the party against whom estoppel is asserted was a party or is in privity with a party to the prior adjudication. *Bajwa v. Metropolitan Life Ins. Co.*, 804 N.E.2d 519, 532 (Ill. 2004). The Illinois Supreme Court also has recognized, however, that "even where the threshold requirements of the doctrine are satisfied, collateral estoppel must not be applied to preclude parties from presenting their claims or defenses unless it is clear that no unfairness results to the party being estopped." *Id.* (citing *Nowak v. St. Rita High School*, 757 N.E.2d 471, 478 (Ill. 2001)). Michael Evans was unquestionably a party to the prior state court criminal trials. Let us assume, for the purpose of this motion, that the element of privity is satisfied.

The first flaw in the collateral estoppel argument is exposed by asking what the state trial court decided and whether that decision was a "final judgment on the merits." There is only a partial transcript of the prior proceedings and no written order setting forth the grounds for any ruling. Without such record, the parties can only speculate as to the limits of any determination and the basis given therefor. Such speculation is manifestly inappropriate grounds for summary judgment. Moreover, given that the parties, and this Court, do not have a record of all of the rulings in the prior proceedings, it is by no means clear that collateral estoppel is even applicable. Plaintiff has provided a portion of Judge Strayhorn's "court sheets" from 1976 which, if admissible, would establish only that the state court judge orally denied a motion to suppress identification without prejudice on June 7, 1976. (Pl.'s Mtn. to Supp. Record, Exh. A.) The defendant police officers supply a transcript of a hearing before Judge Strayhorn in May

1976 in which he denied Evans' motion to quash arrest and heard argument on Evans' motion to suppress Evans' written and oral statements to police. The record of state court proceedings between May 26, 1976 and September 27, 1976, however, appears to be missing.

Plaintiff cites an Eastern District of Virginia case for the proposition that collateral estoppel does not apply when police allegedly withheld exculpatory evidence because the plaintiff, a former prisoner whose conviction was overturned after DNA evidence exonerated him of the crime for which he was convicted, did not have a full and fair opportunity to litigate the issues in the state criminal proceedings. *Snyder v. City of Alexandria*, 870 F. Supp. 672 (E.D.Va. 1994). Evans, likewise, contends that the Individual Defendants, among others, withheld exculpatory evidence concerning the sole eyewitness' identification, and police manipulation of the eyewitness and her husband, and of the victim's family. This Court agrees with the holding of *Snyder* that collateral estoppel does not apply where the "final judgment" was obtained through the withholding of exculpatory evidence. Here, for reasons that will be explained later in this opinion, there is evidence to suggest that exculpatory evidence was withheld. Then there is the problem of the Plaintiff's pardon, which is discussed in reference to the Police Officer Defendants' Motion for Summary Judgment, *infra*.

The Individual Defendants' collateral estoppel argument fails with respect to Judith Januszewski's witness identification, because there is nothing in the record to show that Judge Strayhorn heard arguments on this issue or what the basis for his ruling was. Furthermore, his Court Sheets, even if deemed admissible, note that his denial of Evans' motion was made without prejudice, indicating that it was not a final ruling but rather that the motion was open to renewal before or during trial. In addition, Plaintiff submits testimony from Januszewski's

deposition, along with the deposition of her former husband, that the police detained her at the police station for approximately ten hours on the day she identified Michael Evans as one of the men she claimed to have seen struggling with Lisa Cabassa on the night of the disappearance and murder. Januszewski also testified that she was provided only one inedible meal, and had no access to water or the restroom. Instead, she was repeatedly asked to provide names for the men she had seen on January 14, 1976. The police officers questioning her allegedly suggested various names to her as being the persons she claimed to have seen. Furthermore, Harry Januszewski testified that he spoke to Officers Katalinic and Hill on at least one occasion about his concerns that his wife was not being truthful with them. Harry Januszewski stated that he went with his wife to the court on one of the days she was scheduled to testify with the intention of raising his reservations about her credibility to the prosecutors, only to be detained by the police officers in a holding room until the end of the day. None of this evidence was made available to Evans during his criminal trials or subsequent post-conviction proceedings; Evans contends he only learned of these events during discovery in this proceeding.[5] The Individual Defendants do not dispute this, but argue instead that this evidence fails to meet the *Brady* standard in that it is 1) not favorable to the accused; 2) was not suppressed by the state, either willfully or inadvertently; and 3) was not material to an issue at trial. *Brady v. Maryland*, 373 U.S. 83 (1963).

---

[5] The Individual Defendants note that Evans "was free to call Harry Januszewski as a witness at his criminal trials." This misses the point. Evans certainly was free to call Harry Januszewski, but he did not know that Januszewski had attempted to raise doubts about his wife's testimony and therefore did not know that Januszewski had any bearing on the case. He did not know this information because the police investigating the Cabassa murder had withheld it.

To find a *Brady* violation in Evans' criminal trials, this Court must look at the state of the law at the time. In his opinion granting Evans' motion for a new trial in September 1976, Judge Strayhorn framed the relevant question as whether the undisclosed evidence was material to the guilty or innocence of the defendant. In 1976, the *Brady* line of cases did not require disclosure of a prosecutor's entire file but did require disclosure of evidence material to the defense. The case law interpreted "material" to mean evidence that "creates a reasonable doubt that did not otherwise exist." *United States v. Agurs*, 427 U.S. 97, 112 (1976). It is unclear to this Court how evidence bearing on Januszewski's testimony and credibility could have been immaterial to the defense. Januszewski's eyewitness testimony was the linchpin of the State's prosecution of Evans at both of his criminal trials. Her credibility was of paramount importance to the outcome, as both sides well knew. Indeed, in the case at bar, all parties agree that Judith Januszewski's testimony was key to the state's successful prosecution of Michael Evans. The fact that the eyewitness told police that she had lied to them and that her husband also told police she was not credible potentially could have created reasonable doubt in the mind of the trier of fact. But Evans has not shown, as a matter of law, that he is entitled to summary judgment. The material issues remain disputed and are too fact-specific to be resolved at this stage of the proceeding.

3.      Qualified Immunity

Qualified immunity protects "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, in order to defeat a motion for summary judgment by raising qualified immunity, a defendant must (1) allege that the plaintiff

failed to assert a violation of a valid legal right and (2) failed to demonstrate that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *See, e.g., Saucier v. Katz*, 533 U.S. 194, 201-202 (2001).

Here, Plaintiff clearly alleged the violation of a valid legal right. If the Individual Defendants withheld material exculpatory material from Plaintiff's defense counsel, their actions violated Plaintiff's due process rights to a fair trial. With respect to the second required showing, the facts are less clear-cut. The Individual Defendants rest their argument for qualified immunity on what they contend was at least "arguable" probable cause to arrest Plaintiff. But that is not what is at issue. Rather, scrutiny turns on whether a reasonable officer would have been aware that his conduct was unlawful when he violated Plaintiff's right to a fair trial by withholding material exculpatory evidence and fabricating inculpatory evidence. The City, in its related motion for summary judgment, produced evidence that the Police Rules and Regulations forbade officers to make false reports. Individual police officers testified that they did not know of a CPD policy or practice to withhold exculpatory material, although they also testified that they did not know of any officers who had been disciplined for such conduct. Plaintiff has provided evidence suggesting that officers did, in fact, withhold exculpatory evidence. The Individual Defendants therefore do not meet their burden to establish that they are entitled to qualified immunity.

### 4. Conspiracy

In a constitutional tort case, liability for conspiracy is the same as in common law tort law. The alleged conspirators must be voluntary participants in a common venture, although they do not have to agree on the scheme of the conspiracy or even know who the other conspirators are. It is enough to "understand the general objectives of the scheme, accept them, and agree,

either explicitly or implicitly, to ... further them." *Jones v. City of Chicago*, 856 F.2d 985, 992

(7th Cir. 1988) (citations omitted). Supervisors must have been personally involved in their

subordinates' conduct in order to be held liable for that conduct. *Id.* (citing cases). Negligence,

even gross negligence, is insufficient; the supervisors must "know about the conduct and

facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must

in other words act either knowingly or with deliberate, reckless indifference." *Id.*

Plaintiff simply asserts, in conclusory fashion, that summary judgment on his conspiracy

claim is appropriate. The Individual Defendants respond that genuine issues of material fact

remain in dispute, and list a series of alleged disputed facts relating to the investigation,

prosecution, exoneration, and eventual pardon of Plaintiff. This Court finds that the evidentiary

record is insufficiently developed to support a summary judgment determination at this juncture.

Because the evidence in the record is disputed and, in places, ambiguous, summary

judgment is inappropriate on Plaintiff's Counts I and VII–violation of due process and

conspiracy to violate Plaintiff's due process rights.

### C.     City of Chicago's Motion for Summary Judgment

The City seeks summary judgment on Plaintiff's "policy and practice" claims, alleging

that Plaintiff cannot produce sufficient evidence to show that there was a policy and practice of

withholding exculpatory evidence in so-called street files or to pursue false criminal convictions

through witness and evidence coercion and manipulation. First, the City contends that the

alleged practice of withholding material exculpatory information in "street files" did not exist in

1976, if it ever existed at all. Second, the City asserts that Plaintiff failed to produce evidence

satisfying the requirements for establishing municipal liability for any alleged failure to train or

discipline its police officers. Lastly, the City avers that there is no evidence to support a finding a causation between Plaintiff's alleged constitutional injury and any City policy or practice.

A plaintiff seeking to impose liability upon a municipality under Section 1983 must identify a municipal "policy" or "custom" that caused the plaintiff's injury. *Monell*, 436 U.S. at 694. Acts performed pursuant to a "custom" that "has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. Of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404 (1997) ("*Bryan County*") (citing *Monell*, 436 U.S. at 690-691). But the plaintiff also must demonstrate that the municipality acted with deliberate indifference to the known or obvious consequences of its actions; showing simple or even gross negligence is insufficient. *Bryan County*, 520 U.S. at 407 (citing *Canton v. Harris*, 489 U.S. 378, 388 (1989).

This begs the question, at least for the purpose of this motion, of who the relevant municipal policymaker was. This determination controls whether municipal liability does or does not attach. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (Brennan, J.) ("municipal liability under § 1983 attaches where–and only where–a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question").

The City contends that the municipal policymaker with authority over the Chicago Police Department is the Chicago City Council. Plaintiff, however, has submitted deposition testimony from a Chicago alderman, stating that the City Council delegated authority to the Superintendent of CPD to run day-to-day operations within the Department, including issuing general orders.

(Pls.' Opp. To City's Mtn., Exh. 41, at 86-87.) In particular, under the CPD Rules and Regulations the Superintendent has the authority to "attain the goals and implement" departmental regulations, and supervisory members have the discretion to "delegate authority and functions to subordinates" as part of their responsibility for "adherence to the Department's Rules, Regulations, Policies, Orders, and Procedures."

In the Seventh Circuit, a municipal policymaker has been characterized as "the holder of ultimate power to establish rules of general applicability," generally a legislative body or official. *Auriemma v. Rice*, 957 F.2d 397, 399 (7th Cir. 1992). Sometimes, however, there is a distinction or discrepancy between a municipal *policy* and a municipal *custom*, as the *Auriemma* court recognized: "A practice undertaken by the executive power and suffered by the legislative power may be said to reflect a custom with the force of legislation." *Id.* at 399. Furthermore, a custom can, under specific circumstances, have the force of policy or practice. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("local governments, like every other § 1983 'person,' ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels"). Customs, when sufficiently permanent and well-settled, can have the force of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970).

The Seventh Circuit stated in *Auriemma* that a municipality is liable under § 1983 when its agent's actions "implement rather than frustrate the government's policy." *Id.* at 400. The policy in *Auriemma* was a city ordinance requiring use of a merit selection system in the Chicago Police Department. When a new Police Superintendent took office and demoted seventeen white supervisors but no African-American supervisors, the white former supervisors sued, contending

that the Superintendent demoted them on the basis of their race, in violation of the merit selection system. The Seventh Circuit found that the City's hiring and promotion policy required use of a merit selection system, and that if the Superintendent instead promoted senior staff on the basis of race and politics, he was to be held individually liable. *Id.* If, however, a municipality is aware that its employees have violated its express policies but fails to act on this knowledge, liability under § 1983 may attach. *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986) (citing *Strauss v. City of Chicago*, 760 F.2d 765, 770 (7th Cir. 1985) ("inaction in response to misconduct of its employees may result in municipal liability but only where the injury is caused by 'faults "systemic in nature,"'")). An isolated act by an employee, generally, is insufficient to impose municipal liability. *Monell*, 436 U.S. at 694; *but see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Plaintiff has provided evidence that could support a finding of municipal inaction in the face of repeated and apparently well-known violations of both City and Department policy. Former Chicago Police Superintendent Richard Brzeczek testified at his deposition that he did not disagree with Judge Shadur's finding in *Palmer* that street files were "regularly maintained" at the Area detective facilities and that such practice was "well known throughout the Department." (Brzeczek Dep., Plf.'s L.R. 56.1(b)(3) Stmt., Exh. 27, at 83; *Palmer*, 562 F. Supp. at 1070.)

The City argues that Plaintiff has no competent evidence to support the alleged municipal policy of systematically suppressing *Brady* material or of framing innocent people and securing false criminal convictions through witness coercion and evidence fabrication. Specifically, the City relies on the Muncipal Code of Chicago, the City of Chicago's Department of Police Rules and Regulations, and training bulletins that were effective in 1976 to demonstrate that the City's

express policies contradict Plaintiff's allegations. The CPD Rules and Regulations prohibited police officers from failing to report promptly any information regarding any crime or unlawful action. The inference is that police officers therefore were forbidden from sequestering information or evidence in so-called street files, rather than immediately reporting it through official CPD channels. Police officers thus were likewise forbidden to pursue and secure false criminal convictions. The Standards of Conduct in the CPD Rules and Regulations expressly forbade making a false written or oral report. (City's L.R. 56.1(a)(1) Stmt, Exh. C, at Z04897). According to the City, there was no evidence that its policymaking authorities knew or should have known of any policy or practice of suppressing exculpatory material or framing innocent people.

Plaintiff asserts that the customs or practices of maintaining "street files" and fabricating evidence to secure false convictions was so wide-spread, of such long-standing, and so well-known throughout the Department that it rose to the level of official policy. Multiple court decisions in this District and the Seventh Circuit have noted that evidence of the street files practice has been clearly established. *See, e.g., Jones v. City of Chicago*, 856 F.2d 985, 996 (7th Cir. 1988); *Palmer v. City of Chicago*, 562 F. Supp. 1067, 1069-74 (N.D. Ill. 1983), *rev'd in part*, 755 F.2d 560 (7th Cir. 1985).

Street files were understood to be different and physically separate from either the official case file, maintained at the central records department or the Unit File, maintained at the area headquarters. Plaintiff contends that the City is collaterally estopped from disputing the existence of street files and the practice of maintaining such files by *Jones v. City of Chicago*. 856 F.32d 985, 989 (7th Cir. 1988) ("street files ... were files that the police did not turn over to

the state's attorney's office as they did with their regular investigative files"). The Seventh Circuit, in affirming a jury verdict for a former criminal defendant in a civil rights case arising out of the CPD's failure to disclose exculpatory evidence from street files, stated "The only question is whether this custom [failing to disclose street files and any evidence contained therein] was a custom of the City of Chicago. As the custom was department-wide and of long standing, the jury was entitled to conclude that it had been consciously approved at the highest policy-making level for decisions involving the police department...." *Id.* at 996. There is, therefore, little question that maintaining non-disclosed "street files" was the custom of the City at the time Jones was prosecuted and until Judge Shadur issued a preliminary injunction in the related case of *Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983), despite the City's protestations to the contrary before this court. *See, e.g.*, *Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983), *rev'd in part*, 755 F.2d 560 (7th Cir. 1985) ("*Palmer I*") (class action filed on behalf of all persons in Cook County charged with or convicted of crimes as a result of "street files" practice); *Palmer v. City of Chicago*, 806 F.2d 1986 (7th Cir. 1986) ("*Palmer II*"); *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) (detailing the Chicago Police Department's alleged practice of maintaining undisclosed "street files" in which exculpatory evidence was secreted); *Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003).

Evidence that the CPD had a practice of maintaining street files in 1982 may be suggestive of a similar practice in 1976. This Court notes that the Seventh Circuit has stated that "[t]he Superintendent of Police in Chicago had no power to countermand the statutes regulating the operation of the department." *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992). The difference between countermanding a statute and issuing general orders pertaining to daily

operations remains an open question, however, not amenable to summary judgment. Neither party has adduced evidence clearly showing what authority the Superintendent or supervisory staff at CPD had over implementing mandates from City Council. Plaintiff has raised questions about the apparent discrepancy between official CPD policy and actual CPD practice with respect to case file creation and maintenance, which the City has failed to address in more than conclusory fashion. Whether CPD followed its official policy – and what that policy specifically meant to the Department – is a key issue in the instant litigation and, based on the evidence before the court at this point, not an issue that can be resolved as a matter of law.

### D. Police Officer Defendants' Motion for Summary Judgment

The police officer defendants ("Police Officer Defendants" or "PODs") seek summary judgment on the grounds that collateral estoppel bars Plaintiff's claims of witness manipulation. In addition, the PODs assert that they had probable cause as a matter of law to arrest Plaintiff and are therefore entitled to qualified immunity. As such, they contend that summary judgment should be entered in their favor on each of Plaintiff's remaining claims. Finally, they assert that there is no evidence that the supervisory police officer defendants participated in any of the alleged acts of misconduct, thereby entitling them to summary judgment also.

### 1. Collateral Estoppel

Plaintiff asserts that the PODs engaged in witness manipulation of the type found to violate due process rights in *Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003) ("*Newsome II*"). Specifically, Plaintiff contends that the PODs coerced and coached Judith Januszewski into falsely identifying Michael Evans as one of the men she claims to have seen with Lisa Cabassa on the night of the murder; manipulated the Cabassa family members into changing their

testimony at trial so that it fit with Januszewski's statements; and suppressing exculpatory

evidence in street files and fabricating inculpatory evidence. In addition, Plaintiff denies that

collateral estoppel bars his claims. Rather, Plaintiff notes that both his criminal convictions were

vacated by the state courts.[6] A judgment that has been vacated is thereby deprived of all

conclusive effect, both for the purposes of res judicata and collateral estoppel. *Thomas v. Riddle*,

673 F. Supp. 262, 266 (N.D. Ill. 1987) (plaintiff not collaterally estopped from pursuing coerced

confession theory where appellate court vacated conviction on only one of several grounds

asserted). Vacating a judgment eliminates the preclusive effect not only of the final judgment,

but also of issues determined at trial but not specifically appealed. *Dodrill v. Ludt*, 764 F.2d 442,

444 (6th Cir. 1985) (*per curiam*) (citing *Simpson v. Motorists Mut. Ins. Co.*, 494 F.2d 850, 854-55

(7th Cir. 1974)). If that were not the case, then appellants would be compelled to appeal every

contrary determination, which would foster a Hydra-like judicial bottleneck.

### 2.    Effect of Pardon

Plaintiff then asserts that even if the state court judge's vacation of his conviction is

insufficient to defeat collateral estoppel, his innocence pardon from the Governor of Illinois

does. A general pardon merely "forgives [a defendant] for having committed an offense," 29 Ill.

Law & Prac., Pardon & Parole § 3, whereas an innocence pardon absolves the guilt of a

defendant. *Id.*; *People v. Chiappa*, 368 N.E.2d 925, 926 (Ill. App. Ct. 1977); *see also* Fed. R.

Evid. 609(c)(2) (prohibiting the use for impeachment purposes of a conviction that has been the

---

[6] Plaintiff's first conviction was vacated by Judge Strayhorn after the court learned that the State had failed to disclose money paid to Judith Januszewski in connection with her role in the prosecution. Plaintiff's second conviction was vacated by Judge Porter on May 23, 2003, based on the results of the DNA testing. The State subsequently chose to drop all charges against Plaintiff.

subject of an innocence pardon). The case law and the record before this Court do not clearly establish the impact of a pardon on prior court rulings. Under Illinois law, the recipient of an innocence pardon has the right to petition for expungement of her arrest and for the sealing of the records of the clerk of the circuit court and the Department of Corrections. 20 ILCS 2630/5© (2000). The record before this Court does not establish whether Plaintiff has so petitioned. If he had, however, and the petition had been granted, there would be nothing left to which this Court could accord preclusive effect. Finally, there is the problem of the incomplete trial transcript. The party asserting collateral estoppel has the burden of showing that the prior decision bars the current claim; this showing requires a clear record of what the previous adjudicator found and the grounds for that finding. Such a showing is impossible in the case at bar with respect to Evans' motion to suppress Januszewski's identification. As previously stated, the record contains simply a notation that the motion was denied without prejudice prior to trial by Judge Strayhorn. This Court will not attempt to intuit the arguments that the defense counsel and prosecutors made, much less the reasoning for Judge Strayhorn's preliminary ruling. Collateral estoppel is unavailable. This determination is also supported by the equitable nature of the collateral estoppel doctrine, which prevents application of the doctrine if it would cause unfairness to the party estopped. This Court finds that an innocence pardon acts to prevent prior decisions in the proceeding to which the pardon pertains from having preclusive effect in a subsequent civil rights action such as this.

To analyze a § 1983 due process claim that prosecutors violated the *Brady* rule, a court determines whether 1) the evidence at issue was either exculpatory or impeaching; 2) the evidence was willfully or inadvertently suppressed by the state; and 3) the suppressed evidence

was material to an issue at trial. *U.S. v. Turcotte*, 405 F.3d 515, 530 (7th Cir. 2005). Januszewski testified in her deposition that she was detained at the police station not only on the first day she met with the defendant officers but also on the day of Michael Evans. Further, she stated that the PODs asked her directly whether one of the men she claimed she saw was Michael Evans, thereby potentially tainting her identification. In addition, she testified that she was threatened with physical harm if she did not cooperate, despite her stated unwillingness to testify. These facts, if true, were not available to Plaintiff at either of his criminal trials. At least some of the evidence clearly serves to impeach Januszewski's trial testimony. Januszewski also testified to having approximately 10 to 12 contacts with the PODs during the 40 day period between when she first gave a statement to the CPD and when she identified Michael Evans. There are evidently no existing police reports or notes describing all of these contacts. Harry Januszewski, Judith's ex-husband, testified that he told the PODs that he was concerned about the truthfulness of his wife's story. He also stated that he went to court with her when she was to testify and attempted to meet with the prosecutors about his concerns, but that the PODs intercepted him and locked him in a holding cell in the courthouse until the end of the day. Not only did they fail to question Harry Januszewski about why he questioned his wife's credibility, they forcefully detained and hid him, apparently so that the prosecution and the defense would have no knowledge of his concerns.

The PODs also argue that they had "arguable" probable cause as a matter of law to arrest Plaintiff. They argue that the factual record supports a finding of probable cause and, moreover, assert that Judge Strayhorn's denial of Evans' motion to suppress arrest bars Plaintiff from relitigating this issue. First, even if this Court were persuaded by the PODs arguments, the most

they would do is preclude a claim for false arrest. But the PODs use their probable cause argument against Plaintiff's claim for violation of his right to a fair trial. But Plaintiff's fair trial claim depends on the PODs misconduct in suppressing exculpatory evidence and manipulating witness testimony.[7] In addition, as discussed above, this Court will not accord preclusive effect to the rulings underlying a conviction that has subsequently been vacated and for which the Governor has granted a pardon based on innocence. Plaintiff contends that evidence obtained during discovery in this litigation undercuts the PODs' probable cause argument, namely, that the PODs manipulated and coerced Januszewski into identifying Plaintiff and then suppressed that evidence. In addition, Plaintiff states that eight of the PODs, including three of the four lead investigators, asserted their Fifth Amendment rights when asked whether they manipulated evidence to "frame" Plaintiff. Again, taking the evidence in the light most favorable to Plaintiff, this Court finds that disputed issues of material fact remain on Plaintiff's due process claim.

Drawing all reasonable inferences in favor of the Plaintiff, as required on PODs motion, this Court finds that there remains significant dispute about multiple material issues of fact on Plaintiff's due process claim. Summary judgment is therefore inappropriate.

3.    Count II: False Imprisonment

The PODs seek summary judgment on Plaintiff's false imprisonment claim on the ground that Judge Strayhorn's finding of probable cause for his arrest collaterally estops Plaintiff from relitigating this issue. As previously discussed, this argument is unsuccessful.

---

[7] The PODs' qualified immunity argument fails on this basis as well.

####    4.    Count V: Equal Protection

The PODs again assert that Plaintiff is collaterally estopped from arguing that there was no probable cause for his arrest, rendering him unable to demonstrate that the PODs "purposefully discriminated against him because of his identification with a particular disadvantaged group." *Moton v. Protine*, No. 02 C 8591, 2004 WL 609312, at *6 (N.D. Ill. Mar. 25, 2004). This argument is unsuccessful. In addition, the PODs contend that Judge Strayhorn found that Plaintiff was treated no differently than other suspects in the Cabassa case, but this misstates Plaintiff's claim. Summary judgment is denied.

####    5.    Counts VI, VII, IX, and XI: Conspiracy and failure to intervene

Because this Court has found that disputed issues of material fact remain as to the issue of probable cause and because the facts, taken in the light most favorable to the Plaintiff, could support a finding of conspiracy and failure to intervene, summary judgment is denied as to these counts.

####    6.    Count X: Malicious Prosecution

The PODs seek summary judgment on Plaintiff's malicious prosecution claim on the basis of probable cause. This argument fails.

####    7.    Count XII: Intentional Infliction of Emotional Distress

The PODs contend that Plaintiff has not established any constitutional violation, let alone any conduct that was extreme and outrageous, and therefore summary judgment should be entered in their favor. This Court has addressed Plaintiff's allegations of constitutional violations above. Taking the evidence in the light most favorable to Plaintiff, this Court finds that a reasonable factfinder could determine that the PODs conduct was extreme and outrageous; that

the PODs intended or knew that it was likely that their conduct would cause severe emotional distress; and that such distress in fact resulted. Summary judgment is denied.

## Conclusion

For the foregoing reasons, all motions for summary judgment and the motion to strike are denied.

Enter:

/s/ David H. Coar
_____
David H. Coar
United States District Judge

Dated: **January 6, 2006**